237 N.J. Super. 359 (1989)
568 A.2d 75
CHEMOS CORP., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
STATE OF NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION DIVISION OF HAZARDOUS WASTE MANAGEMENT, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 31, 1989.
Decided December 15, 1989.
*360 Before Judges ANTELL, BILDER and ASHBEY.
Betsy Rosenbloom argued the cause for appellant (Fox and Fox attorneys; Betsy Rosenbloom, on the brief).
Stuart J. Lieberman argued the cause for respondent (Peter N. Perretti, Jr., Attorney General, attorney; Michael R. Clancy, Assistant Attorney General, of counsel; Stuart J. Lieberman, on the brief).
PER CURIAM.
Plaintiff Chemos appeals from the action of the Department of Environmental Protection (DEP) rescinding its approval of a "negative declaration" that Chemos' leased industrial site could *361 legally be closed without penalty or cleanup under the Environmental Cleanup Responsibility Act (ECRA), N.J.S.A. 13:1K-6 et seq., and the rules, regulations and procedures adopted thereunder (N.J.A.C. 7:26B-1.1 et seq.).[1] We affirm based on our conviction that Chemos was not prejudiced by DEP error. Nonetheless, we write briefly concerning the absence of DEP regulations with respect to the actions which Chemos challenges.
We begin with a brief review of the Act. The Environmental Cleanup Responsibility Act (ECRA), N.J.S.A. 13:1K-6 et seq., was enacted in 1983 to provide for expeditious cleanup of industrial sites at the time they are closed, sold or otherwise transferred. The object of the statute was to impose:
... a precondition on the closure, sale or transfer of certain properties associated with the manufacture, refining, transportation, treatment, storage, handling, or disposing of hazardous substances or wastes. The precondition is the execution of an approved cleanup plan which details the measures necessary to detoxify the property, or the approval by the Department of Environmental Protection of a [negative] declaration that there has been no discharge of hazardous substances or wastes on the property or that any such discharge has been cleaned up in accordance with procedures approved by the department and there remain no hazardous substances or wastes on the property. [Senate Energy and Environment Committee Statement, Assembly, No. 1231-L. 1983, c. 330 (appended to N.J.S.A. 13:1K-6 at 199)].
The legislative intent was clearly expressed in its finding
... that the generation, handling, storage and disposal of hazardous substances and wastes pose an inherent danger of exposing the citizens, property and natural resources of this State to substantial risk of harm or degradation; that the closing of operations and the transfer of real property utilized for the generation, handling, storage and disposal of hazardous substances and wastes should be conducted in a rational and orderly way, so as to mitigate potential risks; and that it is necessary to impose a precondition on any closure or transfer of these operations by requiring the adequate preparation and implementation of acceptable cleanup procedures therefor. [N.J.S.A. 13:1K-7]
To that end,
strict requirements are established requiring owners or operators of an industrial establishment planning to close, sell or transfer operations to give notice to *362 DEP, N.J.S.A. 13:1K-9 and to develop and implement a DEP approved cleanup plan unless DEP defers the cleanup in certain specified instances. N.J.S.A. 13:1K-9 & 11. [Superior Air Prod. v. NL Industries, 216 N.J. Super. 46 at 62-63 (App.Div. 1987).]
It is of course clear that ECRA is a "no fault" statute which carries sanctions for failure to comply. See N.J.S.A. 13:1K-13a; N.J.A.C. 7:26B-1.7(a),[2] and the courts have liberally interpreted its remedial language. See Dixon Venture v. J. Dixon Crucible, 235 N.J. Super. 105 (App.Div. 1989) (ECRA remedies include incidental damages as between buyer and seller of ECRA regulated land); Matter of Fabritex Mills, Inc., 231 N.J. Super. 224 (App.Div. 1989) (abandonment of hazardous substance manufacture leaving unlabeled drums is not a continuation of "storage" activity and triggers ECRA cleanup); Matter of Vulcan Materials Co., 225 N.J. Super. 212 (App.Div. 1988) (closure of industrial establishment located on landfill does not trigger cleanup under the Solid Waste Management Act, but does trigger ECRA); In re Robert L. Mitchell Tech. Ctr., 223 N.J. Super. 166 (App.Div. 1988), certif. den. 111 N.J. 605 (1988) (transfer of research facility auxiliary to industrial establishment triggers ECRA).[3]
Chemos proposed to close its ECRA-covered "small business" industrial establishment. N.J.A.C. 7:26B-1.10(d). See N.J.S.A. 13:1K-8f. The facility had long been involved in the manufacturing of coatings for metal, wood and plastic. The substances used in its manufacture of enamels, lacquers and paints were stored in drums, and its hazardous substance inventory included: Acetone, Toluene, Amyl Acetate, Methyl Ethyl Ketone, Methanol, Ethyl Acetate, Nitrocellulose, Xylene, Ethanol, Dibutyl *363 Phthalate, N-Butanol, Butyl Acetate, Butyl Alcohol, Dioctyl Phthalate, mineral spirits, and Sodium Hydroxide, all of which it asserted had been or would be removed from the site as part of its closure plan.[4]
In order to evaluate Chemos' ECRA appeal, a brief review of the applicable regulations is in order. Under DEP regulations ECRA applies upon "triggering" events. One such "trigger" is the cessation of operations. N.J.A.C. 7:26B-1.5(b)15. Another is the termination of a lease. N.J.A.C. 7:26B-1.5(b)13. Both of these "triggers" applied to Chemos. An industry proposing to close its operation must give written notice to DEP no more than 5 days subsequent to public release of the closure decision, N.J.A.C. 7:26B-1.6(a)3, along with a general information statement (GIS). This GIS must be followed by a Site Evaluation Submission Statement (SES) within 45 days. N.J.A.C. 7:26B-3.2(c). The SES requires inter alia a detailed sampling plan for soil, surface water, groundwater and air. N.J.A.C. 7:26B-3.2(c)11. The only way that the operator of the industrial establishment may avoid the sampling plan requirement is to "propose [exemption] to the Department ... by providing full documentation of the justification ... [other than economic]." N.J.A.C. 7:26B-3.2(d). After a sampling plan is approved, DEP must be able to observe the taking of samples and may take its own samples. N.J.A.C. 7:26B-4.2. Sampling results must be accompanied by a proposed negative declaration (or cleanup plan), and if not satisfied, DEP may require further sampling. N.J.A.C. 7:26B-4.3. DEP notifies the applicant when required information has been satisfactorily submitted and the filings are complete. N.J.A.C. 7:26B-3.2(f).[5]
There is no applicable statutory or regulatory time-frame for DEP's approval of a cleanup plan. Under the statute, however, *364 an applicant may seek a "negative declaration" (that no hazardous substances remain) and within 45 days of the submission of this proposed negative declaration, DEP must approve the negative declaration or inform the industrial establishment that a cleanup plan is to be submitted.[6]N.J.S.A. 13:1K-10b; N.J.A.C. 7:26B-5.2. Under its regulations DEP "shall" not approve the negative declaration until notice and sampling plan requirements are met. N.J.A.C. 7:26B-5.1(b). Following submission of a negative declaration, if the Department so determines, the owner or operator must submit a cleanup plan within the time DEP specifies. N.J.S.A. 13:1K-10b; N.J.A.C. 7:26B-5.2(d)2.
In preparation for seeking DEP approval of a negative declaration, on or about August 3, 1988, Chemos filed its GIS and notified DEP's Division of Hazardous Waste Management that it had ceased doing business as of that date at the site (which was owned by Alken Realty Co., Inc. (Alken), its landlord). DEP immediately advised Chemos that it had not given sufficient lead time (60 days) prior to closing, which might affect the validity of its action under ECRA, and that it would not review whether the site as closed complied with ECRA until Chemos' SES was submitted. Chemos filed its SES on September 16, 1988. The SES indicated that a sampling plan "is currently in preparation and will be submitted subsequent to this document." DEP sent a deficiency notice, noting the absence of a sampling plan. In answer to DEP's deficiency notice of October 13, 1988, Chemos filed an SES supplement on March 2, 1989, providing results of fuel oil tank integrity test but no sampling plan. Its SES supplement said, "Since the fuel oil tank has been certified as tight and no other sampling appears necessary, a sampling plan will not be filed." Chemos submitted an affidavit seeking a negative declaration on March 2, 1989, certifying that no hazardous substances remained on the *365 premises, except for the remaining fuel oil tank. On March 31, 1989, Chemos terminated its lease (apparently by its terms). On April 5, 1989, DEP sent Chemos a notice that its filings were complete as of March 8, 1989, but again advising Chemos that
an approvable negative declaration or cleanup plan must be provided [to DEP] 60 days prior to finalization of the proposed action. Since such lead time was not provided in this case, it is entirely possible that our review will not be completed by your proposed date.[7]
On April 11, 1989, DEP case manager Georgette E. Bunch conducted an inspection of the site. In answer to further DEP inquiries regarding a protruding pipe, ground solvent tanks in the drum storage area and flooring the sump area, Chemos mailed supplementary affidavits on April 13, 20 and 24. No sampling or cleanup plan was required of Chemos immediately following the inspection. In its April 24, 1989 cover letter with supplementary material, Chemos again said that no sampling plan would be submitted.
On May 4, 1989, DEP issued a letter approving the negative declaration and by letter of June 1, 1989, DEP rescinded its approval.[8] The rescission letter was accompanied by an April 11, 1989 Report of Inspection in which DEP required Chemos provide DEP with access to the premises to pay additional fees and to provide further filings (site evaluation, sampling plan).[9]
DEP's report said the following:
DEFICIENCIES NOTED
1. Integrity and condition of tank farms were not proven.

*366 2. A complete and thorough site evaluation was not conducted to address the age of the building, the high volume chemical use at the site, building contamination and outdoor drum storage.
3. Integrity of the sumps were not proven.
ACTIONS REQUIRED ON THE PART OF THE APPLICANT
1. Comet [Chemos] shall submit a Sampling Plan to address the following areas of concern:
a. Integrity of tank farms.
b. Integrity of sumps.
c. All outdoor drum storage areas.
d. Any asbestos on site.
e. Fill lines associated with the above ground storage tanks.
f. Condition of soil in diked areas (include dates of paving).
g. Proof of building decontamination.
On appeal DEP claims its issuance of a negative declaration approval was a simple mistake which it corrected.
In support of its rescission, DEP relies on its regulations and cases supporting the principle that its administration of ECRA should be given a liberal construction in order to achieve its public health purposes. See GATX Term. Corp. v. Environmental Prot. Dep't., 86 N.J. 46, 52 (1981); Matter of Vulcan Materials Co., 225 N.J. Super. at 220; In re Environmental Protection Dep't, 177 N.J. Super. 304, 318 (App.Div. 1981); Lom-Ran v. Dept. of Environmental Protection, 163 N.J. Super. 376, 384 (App.Div. 1978). In furtherance of this legislative mandate, DEP urges that it must not be hampered by a ministerial error.
In the absence of some legislative restriction, administrative agencies have the inherent power to reopen or to modify and to rehear orders that have been entered. [Ruvoldt v. Nolan, 63 N.J. 171, 183 (1973), quoting from Burl. Cty. Evergreen Pk. Mental Hosp. v. Cooper, 56 N.J. 579, 600 (1970)]
Chemos' primary argument is that DEP's rescission action, if countenanced, imperils all rights in real property and the finality of business transactions. Respecting its own reliance, it asserts that third parties have made use of the premises since the termination of Chemos' tenancy, and Alken (the landlord) *367 will not permit Chemos to reenter.[10] Chemos' assertions of reliance are unsupported, however. Chemos acknowledges receiving the telephone call on May 11, 1989 from DEP in which it was informed that DEP was reviewing its approval of the negative declaration. Moreover, Chemos' delay in making corrective DEP submissions between October 1988 and March 1989 is unexplained. We cannot find that Chemos is entitled to relief because it relied on DEP action.
Nor do we find any reason that Chemos should have avoided the sampling plan requirement simply because the premises had received a negative declaration four years earlier. Chemos concedes that DEP's review of sampling plan data usually precedes its ruling on whether the owner or operator will be required to submit either a negative declaration or a cleanup plan. Chemos' March 1989 SES reference that it would not supply a sampling plan (admittedly not based upon DEP assurances), submitted less than one month before its lease terminated, could not be characterized as "providing full documentation of the justification" for being exempted from the sampling plan requirement under N.J.A.C. 7:26B-3.2(d).[11] Although the relatively new DEP case manager and her immediate supervisor determined that the negative declaration should be approved without requiring the sampling plan, their DEP superior rejected these findings. We are satisfied that DEP under its mandate had a right to reject staff recommendations and to rescind its incorrect prior approval in the absence of injurious reliance by Chemos.[12]
*368 Nonetheless, the procedure is troubling. All of the documents in DEP's file establish that as of March 8, 1989, DEP had agreed with Chemos that no sampling plan and no supplemental site evaluation were necessary, including DEP's ECRA Environmental Concern Tracking Sheet which says that "no action [was] required" regarding each of the items later alleged to be deficient. Moreover, Chemos claims the sampling plan and supplemental site evaluation now required are not required in the majority of ECRA filings, particularly where the site had received a prior DEP approval within four years. As Chemos asserts, DEP had no reason of record to justify Chemos' belated "high environmental concern" classification.[13]
Chemos traces DEP's asserted arbitrariness to the fact that detoxification standards have never been promulgated. Cf. A.A. Mastrangelo, Inc. v. Environmental Protec. Dep't., 90 N.J. 666, 684 (1982), citing In Re Jamesburg High School Closing, 83 N.J. 540, 549 (1980); Gladden v. Public Employees Retirement System Trustee Bd., 171 N.J. Super. 363, 374 (App. Div. 1979).
N.J.S.A. 13:1K-10a provided,
The department shall ... adopt rules ... establishing: minimum standards for soil, groundwater and surface water quality necessary for detoxification of the site ... to ensure that the potential for harm ... is minimized ... taking into consideration the location ...; criteria necessary ...; a fee schedule ...; and any other provisions or procedures necessary to implement this act. Until the minimum standards ... are adopted, the department shall review ... negative declarations and cleanup plans on a case by case basis.
N.J.A.C. 7:26B-11.1 provides:
Until adoption of the minimum standards required pursuant to Section 5(a) of the Act, N.J.S.A. 13:1K-10, the Department shall review, approve or disapprove negative declarations and cleanup plans on a case-by-case basis for soil, ground water and surface water quality necessary for the cleanup of the industrial establishment, including buildings and equipment, to ensure that the potential for harm to public health and the environment is minimized to the maximum *369 extent practicable, taking into consideration the location of the industrial establishment, surrounding ambient conditions, and other relevant factors.
While DEP's enforcement regulations have been modified on a regular basis, the regulations mandated by statute are not yet in effect.[14]
Chemos' position is thus well taken, although it does not necessarily follow that Chemos may prevail on those grounds. Whatever quality standards were in effect, they obviously could not be applied to Chemos' industrial site unless it was tested. At issue in Chemos' appeal, we conclude, is not minimum quality standards but standards to determine when a sampling plan is required.
Plaintiff's requests for sampling plan standards have been presented to DEP as public comment concerning its regulations,[15] and DEP has resisted such requests saying, "[s]ince fact patterns vary, it is important for the Department to maintain flexibility in evaluating information provided...." 21 N.J.R. 2380, (DEP response to Comment 143 respecting proposed 1989 rule amendment to N.J.A.C. 7:26B-10.1(e)). We agree with DEP that the right to demand independent verification of an applicant's assertions that its industrial site is detoxified is quite separate from having standards of what is acceptable detoxification.
The requirements are related however. See Vi-Concrete v. State of New Jersey, Department of Environmental Protection, 115 N.J. 1 (1989), citing Lower Main St. Assocs. v. New Jersey Hous. & Mortgage Fin. Agency, 114 N.J. 226, 232 (1989); Department of Envtl. Protection v. Stavola, 103 N.J. 425, *370 436-38 (1986); Department of Labor v. Titan Const. Co., 102 N.J. 1, 12-18 (1985). Had DEP promulgated standards for what is the acceptable level of the substances in question, based upon DEP's expertise respecting the nature of the substance and its potential to migrate in water or earth, both Chemos and DEP personnel would have better understood what independently verifiable facts met that standard. It also follows that each could more easily know when sampling plans would be required. There would be less opportunity for the creation of a record supporting a claim of arbitrariness. Ibid.
In sum we are satisfied that because Chemos was well aware of DEP's existing ECRA requirements, the promulgation of toxicity standards would not have affected the need to test Chemos' site to see if those standards were met. Chemos may thus not claim prejudice from their absence. While we recognize that the task is not easy, we are also satisfied that DEP's issuance of the required quality standards would improve the ECRA process, not only for the benefit of industry, but for the guidance of staff.[16]
Affirmed.
NOTES
[1] On July 12, 1989 Chemos sought temporary restraints from the Law Division or in the alternative on appeal. A stay was granted pending appeal and DEP's motion to accelerate this appeal was granted.
[2] The owner and operators are forbidden to transfer an industrial establishment until ECRA compliance. N.J.A.C. 7:26B-5.1(c). Other penalties include a civil penalty of $25,000 for each day of offense. N.J.A.C. 7:26B-9.3(a).
[3] For a more complete analysis, see New Jersey's Experience Implementing the Environmental Cleanup Responsibility Act, 38 Rutgers L.Rev. 729 (1986); Note, The Environmental Cleanup Responsibility Act (ECRA); New Accountability for Industrial Landowners in New Jersey, 8 Seton Hall Legis.J. 331, 363 (1985).
[4] At oral argument, Chemos in effect conceded that the premises it rented had been used to house chemicals for probably more than 100 years.
[5] At our request we have received and reviewed relevant DEP forms.
[6] A negative declaration may also be submitted on the site where there has been no discharge of hazardous substance, a circumstance which does not here apply. N.J.S.A. 13:1K-8g.
[7] Chemos apparently notified DEP of the March 31, 1989 lease termination informally. As noted, its GIS said it had ceased operations in August 1988.
[8] Chemos was notified of DEP's potential rescission by telephone May 11, 1989.
[9] Chemos claims that this Report of Inspection was "highly unusual and possibly unique."
[10] At oral argument Chemos conceded that Alken would permit entry but would exact a price.
[11] Although not applicable to this case, N.J.A.C. 7:26B-10.1(e), effective August 7, 1989, provides that even when an industrial establishment qualifies for a de minimus exemption from ECRA requirements, a sampling plan may be required.
[12] We disregard reasons proffered in DEP's brief not of record.
[13] For a detailed analysis of the effect of this classification on DEP delay, see ECRA: A Manager's View of the Cleanup Statute, 123 N.J.L.J. 810, March 30, 1989.
[14] Interim regulations were effective until 1987. See Matter of Fabritex Mills, Inc., 231 N.J. Super. at 229. See also ECRA Developments: Proposals, Other Items, 123 N.J.L.J. 818, March 30, 1989, concerning subsequent 1988 and 1989 regulations.
[15] Our review of the comment process persuades us that the absence of quality standards has not concerned the regulated as have other aspects of the regulations.
[16] In his article of March 30, 1989, the Deputy Director of the Responsible Party Remedial Action Program of the DEP Division of Hazardous Waste Management asserted that such regulations were being prepared, see ECRA: A Manager's View of the Cleanup Statute, 123 N.J.L.J. 810, March 30, 1989. Assembly, No. 59, pre-filed before the 1988 session, directed that DEP use the standards of the Federal Environmental Protection Agency while adopting criteria concerning cleanup plans within six months. (Assembly, No. 59, § 5, passed Assembly Feb. 22, 1988; referred to the Senate Committee on Energy and Environment).