669 A.2d 239

I/M/O CADGENE FAMILY PARTNERSHIP.

Superior Court of New Jersey
Appellate Division

Argued September 19, 1995—Decided October 19, 1995.

Before Judges MICHELS, BAIME and KIMMELMAN.

*Timothy S. Haley* argued the cause for appellant Cadgene Family Partnership (*Sullivan & Sullivan*, attorneys; *Arthur J. Sullivan, Jr.*, of counsel; *Mr. Haley*, on the brief).

*Karen L. Jordan*, Deputy Attorney General, argued the cause for respondent DEP (*Deborah T. Poritz*, Attorney General, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel; *Ms. Jordan*, on the brief).

*Dennis J. Smith* argued the cause for respondent Paterson Laundry & Dye Works (*Clancy, Callahan & Smith*, attorneys; *Mr. Smith*, of counsel; *James J. Cronin*, on the brief).

*Craig S. Provorny* argued the cause for respondent McLean Boulevard Associates (*Herold & Haines*, attorneys; *Anthony J. Reitano*, of counsel; *Mr. Provorny*, on the brief).

The briefs of Cristany Print Works, Inc., Mirarobles, Inc., and Textile Piece and Dyeing Company, Inc. were suppressed.

The opinion of the court was delivered by

BAIME, J.A.D.

Cadgene Family Partnership Industrial Establishment (Cadgene) appeals from the action of the Department of Environmental Protection (DEP) rescinding its approvals of Cadgene's letter of non-applicability and negative declaration. The DEP concluded that Cadgene had withheld material information when applying for these approvals. Although phrased in a variety of ways, Cadgene contends (1) the DEP abused its discretion by reopening issues previously decided, (2) the DEP's determination was not supported by sufficient credible evidence in the record, (3) the administrative agency failed to make detailed findings of fact, (4) the regulations in force when the approvals were originally sought were invalid because they were not sufficiently detailed and objective, and (5) the matter should be remanded to the Office of Administrative Law for an adjudicatory hearing. We find no merit in these arguments. *R.* 2:11–3(e)(1)(D) and (E).

I.

The Environmental Cleanup Responsibility Act (ECRA) (*N.J.S.A.* 13:1K–6 to –13), now known as the Industrial Site Recovery Act (ISRA), requires owners and operators of industrial sites, as a condition precedent to closing, sale or transfer, either to develop a cleanup plan for real property contaminated by hazardous waste or to certify in a "negative declaration" that remediation is unnecessary. *In re Adoption of N.J.A.C. 7:26B,* 128 *N.J.* 442, 445, 608 *A.2d* 288 (1992). A negative declaration is a written statement submitted by the owner or operator, certifying that there has been no discharge of hazardous substances on the site, or that, if one has occurred, the property has been remediated in accordance with standards established by the DEP. *N.J.S.A.* 13:1K–8. If the owner or operator believes that the requirements

of ECRA are not applicable, it may apply to the DEP for an applicability determination. *N.J.A.C.* 7:26B–1.9. Noncompliance with ECRA may result in voiding the sale of an industrial site and may make the owner or operator strictly liable, without regard to fault, for all remediation costs. *N.J.S.A.* 13:1K–13; *In re Adoption of N.J.A.C. 7:26B,* 128 *N.J.* at 449, 608 *A.*2d 288.

At issue here is whether Cadgene complied with this statutory mandate when it sold industrial property to McLean Boulevard Associates (McLean) in 1986. Cadgene purchased the property in 1910. Over the years it leased portions of the property, including lots 21 and 27F, to various tenants. From 1935 to 1982, Brewster Finishing Corporation (Brewster) used the property for dyeing and finishing textiles. From the early 1940's until at least 1987, Textile Piece and Dyeing Company (TPD) also performed these operations on a portion of the property.

In 1986 Cadgene contracted to sell the property to McLean. At the time of the sale, most of the property was leased to TPD, but not lots 21 and 27F. Nevertheless, the record contains overwhelming evidence that TPD used lots 21 and 27F with Cadgene's implied or express assent. It is also abundantly plain from the record that, at the time of the sale, Cadgene knew full well that TPD had performed industrial operations on the site of these lots.

In April of 1987, Cadgene, notwithstanding this knowledge, certified to the DEP that lots 21 and 27F were exempt from ECRA's requirements. Based on Cadgene's documentary submissions, the DEP approved Cadgene's letter of non-applicability on May 18, 1987. The DEP noted that its approval was "made in light of the absence of an industrial establishment ... as covered by [ECRA]," adding that "[a]ny inaccuracies in [Cadgene's] affidavit ... could alter [its] determination."

Cadgene had retained AccuTech as its environmental consultant. At various times, AccuTech warned Cadgene that the DEP might some day learn of TPD's industrial use of lots 21 and 27F. Under a procedure adopted by the DEP, an owner or operator may seek an administrative consent order allowing a transfer to

take place before full compliance with ECRA and obligating the applicant to complete the site investigation and any required remediation at a future time. *N.J.A.C.* 7:26B–7.1 to –7.6. Cadgene sought to avail itself of this procedure, but was warned by AccuTech of a "potential problem" because an ECRA case manager "upon his site inspection, may see TPD (or the subtenant) operating upon a portion of tax lot[s] 27F and/or 21, lots which we have previously exempted from this application claiming no one is operating upon them."

In documents submitted to the DEP in support of its application for approval of its negative declaration, Cadgene minimized the possibility of industrial pollution at the site. Although the DEP requested "[a] detailed description of the most recent operations and processes ... with particular emphasis on areas ... where hazardous substances and wastes are generated, manufactured, [or] refined," Cadgene submitted a response stating "[t]here have been no known recorded spills or discharges during the historical operation of the facility" and adding that "no [s]ampling [p]lan [was] necessary for this facility." Cadgene did allude to the existence of storage tanks on the property, noting that "[u]nderground storage tank integrity documentation [was] to be provided when complete." Although these documents were submitted to the DEP on August 5, 1987, AccuTech had previously warned Cadgene that it was "important that we eliminate" "areas of concern" in addition to the storage tanks "such as electrical transformers and asbestos." Indeed, on the very day Cadgene submitted the documents we have described to the DEP, it was informed in a letter by AccuTech that:

> the ... two 55,000 gallon abandoned underground storage tanks, the electrical transformers, and the asbestos filled boiler room needs to be resolved.... A general pre-ECRA cleanup of the facility will assist in minimizing areas of environmental concern. Specific areas are dumpsters, operation discharges to outside areas, the boiler room courtyard area and the building interior including the subbasement.

AccuTech was particularly concerned with the "subbasement," which it characterized as "strewn with debris."

In subsequent submissions relating to the administrative consent order, Cadgene represented "there are no environmental contamination problems on the site known to [the] [a]pplicant." A section in the DEP's application form requested Cadgene to check all applicable categories "of [e]nvironmental [c]oncern." Among these categories were discharge, floor drain, spill, dumpster, asbestos, tank farms, and transformers. Although the record clearly indicates that many of these environmental concerns were applicable to the property in question, Cadgene only checked the category marked "asbestos." Cadgene later amended the application, noting that "asbestos" had been checked by mistake and that the only applicable category related to "underground storage tanks." Based on these documents, an administrative consent order was issued, and McLean took possession of the property.

On April 26, 1988, a caseworker assigned to the Bureau of Environmental Evaluation and Cleanup Assessment visited the TPD site. Because of Cadgene's prior submissions, the caseworker's principal concern was the underground storage tanks. He did not report on the condition of the property, but he did note that "the chemicals ... have been removed ... to an unknown destination."

The DEP approved Cadgene's negative declaration on September 27, 1988. However, ECRA was triggered when Paterson Laundry & Dye Works, Inc., a sublessee of TPD, ceased operations in March 1991. At about the same time, Cadgene instituted a foreclosure action against McLean. In a counterclaim McLean asserted that Cadgene had duped the DEP by withholding material information in its letter of non-applicability and its negative declaration. McLean thereafter petitioned the DEP to revoke its prior approvals. The DEP denied McLean's application "without prejudice." McLean appealed to this court, and we remanded the matter for dispute resolution. *N.J.S.A.* 58:10B–17.

On remand the DEP issued a decision on April 13, 1994, rescinding its approvals of Cadgene's letter of non-applicability and negative declaration. The DEP found that Cadgene had

withheld material information regarding TPD's use of lot 27F as an industrial establishment and had failed to identify applicable "areas of environmental concern" with respect to both lots. The Commissioner subsequently denied Cadgene's application for reconsideration.

We examine Cadgene's contentions in light of this factual backdrop.

## II.

The DEP did not abuse its discretion by reopening the case. An administrative agency has the inherent power to rehear and modify orders it has previously entered. *In re Trantino Parole Application,* 89 *N.J.* 347, 364, 446 *A.*2d 104 (1982); *Ruvoldt v. Nolan,* 63 *N.J.* 171, 183, 305 *A.*2d 434 (1973); *Burl. Cty. Evergreen Pk. Mental Hosp. v. Cooper,* 56 *N.J.* 579, 600, 267 *A.*2d 533 (1970). Of course, this power must be exercised reasonably and with due diligence. *Ruvoldt v. Nolan,* 63 *N.J.* at 183, 305 *A.*2d 434. Where, as here, a party has induced a governmental body to render a favorable decision by withholding critical information, it is in a poor position to complain when its misdeeds are later discovered and the administrative determination changed.

In any event, it bears repeating that we directed the DEP to reexamine its prior approvals in our resolution of McLean's appeal. The agency cannot be faulted for complying with our order.

## III.

The DEP's findings could reasonably have been reached on sufficient credible evidence present in the record. *Mayflower Securities v. Bureau of Securities,* 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973); *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965). It cannot fairly be said that the agency's conclusion is so clearly mistaken and so plainly unwarranted that the interests of justice demand intervention and correction. *Cf. State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964). Indeed, the opposite is true.

The record fairly reeks of Cadgene's evasion and dissembling in seeking the approvals of its letter of non-applicability and negative declaration.

Cadgene heavily relies on the fact that a caseworker visited the site and was thus aware of TPD's prior use of the property as an industrial establishment as well as the potential environmental problems obvious to a disinterested observer. We note, however, that the DEP had already approved Cadgene's letter of non-applicability by the time of the caseworker's inspection. Moreover, it is certainly arguable that the DEP had been lulled into believing there were no environmental problems at the site. Surely Cadgene's submissions were designed to have that effect.

In any event, even assuming the caseworker was less than diligent, this would not excuse Cadgene's calculated effort to withhold critical information from the DEP. The findings made by the DEP were supported by substantial evidence. We perceive no sound basis to disturb these findings or the conclusions reached.

## IV.

We also reject Cadgene's contention that the DEP's findings of fact were materially deficient. Specifically, we are unpersuaded by Cadgene's claim that insufficient findings were made as to lot 21.

Fact-finding is a basic duty that agencies acting in a quasi-judicial capacity must perform. *In re Issuance of a Permit,* 120 *N.J.* 164, 172, 576 *A.*2d 784 (1990). "An agency must engage in fact-finding to the extent required by statute or regulation, and provide notice of those facts to all interested parties." *Id.* at 173, 576 *A.*2d 784; *see also In re Application of Howard Savings Inst.,* 32 *N.J.* 29, 52, 159 *A.*2d 113 (1960); *New Jersey Bell Tel. Co. v. Communications Workers of America,* 5 *N.J.* 354, 375, 75 *A.*2d 721 (1950).

We are satisfied that the DEP fulfilled its fact-finding obligation. The agency rendered specific, detailed findings regarding lot 27F. Although the DEP's findings respecting lot 21 were not as extensively articulated, we are convinced that a remand to the agency is unnecessary.

## V.

In our opinion in *In re Adoption of N.J.A.C. 7:26B*, 250 *N.J.Super.* 189, 593 *A.*2d 1193 (App.Div.1991), *aff'd in part, rev'd on other grounds*, 128 *N.J.* 442, 608 *A.*2d 288 (1992), we held that the DEP's regulation regarding what must be set forth in an applicant's letter of non-applicability was unduly vague. *Id.* at 225, 593 *A.*2d 1193. The regulation provided that an applicant must "[d]emonstrate to the Department's satisfaction that the Act or this chapter is not applicable." *N.J.A.C.* 7:26B–1.9.

Our decision did not have the effect of abrogating the statutory requirements of ECRA or excusing the blatant misconduct of applicants who deliberately withheld material information. The statutory definition of "industrial establishment" contained in *N.J.S.A.* 13:1K–8f (now *N.J.S.A.* 13:1K–8) was, and is, crystal clear. TPD's use of lots 21 and 27F plainly fell within the purview of that definition. With or without valid implementing regulations, Cadgene was duty-bound to apprise the DEP of this fact and the corresponding potential environmental problems.

The purpose of ECRA, and now ISRA, is to remedy the "legacy of hazardous waste" left after decades of industrial activity. *In re Adoption of N.J.A.C. 7:26B*, 128 *N.J.* at 446–47, 608 *A.*2d 288. The owner or operator of an industrial facility at the time of the transaction triggering the statute is bound by a "self-executing duty to remediate." *Id.* at 448, 608 *A.*2d 288 (quoting *Superior Air Prods. v. N.L. Indus.*, 216 *N.J.Super.* 46, 63–65, 522 *A.*2d 1025 (App.Div.1987)). The program is dependent on accurate and complete submissions to DEP by owners and operators. Cadgene clearly knew of its duty but sought to evade its responsi-

bility under the statute. We discern no error in the DEP's subsequent curative action.

## VI.

Finally, we find no need for an adjudicatory hearing. The critical facts are undisputed.

Affirmed.