712 A.2d 1165

IN RE RAILROAD REALTY ASSOCIATES.

Superior Court of New Jersey
Appellate Division

Argued May 27, 1998—Decided June 17, 1998.

Before Judges LONG, KLEINER and KIMMELMAN.

*Donald J. Camerson, II,* argued the cause for appellant First Indemnity of America Insurance Co. as surety for Railroad Realty

Associates (*Bressler, Amery & Ross,* attorneys; *David W. Reger, Mr. Camerson,* and *Jane J. Kim,* on the brief).

*Rachel Jeanne Lehr,* Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (*Peter Verniero,* Attorney General, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel, *Ms. Lehr,* on the brief).

The opinion of the court was delivered by

KIMMELMAN, J.A.D.

Appellant First Indemnity of America Insurance Company, as surety for Railroad Realty Associates, a bankrupt company, appeals from a final agency decision of the State of New Jersey, Department of Environmental Protection (DEP), which denied appellant's request to rescind two negative declaration approvals issued under the New Jersey Environmental Cleanup Responsibility Act (ECRA), now known as the Industrial Site Recovery Act (ISRA), *N.J.S.A.* 13:1K–6 to –33.

ISRA requires owners and operators of industrial establishments to demonstrate that the property is environmentally sound as a precondition to sale or transfer of the property or the closure of a business. *N.J.S.A.* 13:1K–9a. This precondition may be met through submission to the DEP of either a negative declaration or a "remedial action workplan." *N.J.S.A.* 13:1K–9c; *N.J.A.C.* 7:26B–6.7; *N.J.A.C.* 7:26B–1.6. ISRA defines a "[n]egative declaration" as follows:

> [A] written declaration, submitted by the owner or operator of an industrial establishment or other person assuming responsibility for the remediation ... to the [DEP] certifying that there has been no discharge of hazardous wastes on the site, or that any such discharge has been remediated in accordance with procedures approved by the [DEP] and in accordance with any applicable remediation regulations[.]
>
> [*N.J.S.A.* 13:1K–8; *see also N.J.A.C.* 7:26B–1.4]

The statute further provides that all obligations imposed pursuant to ISRA constitute "continuing regulatory obligations imposed by the State" which may not be avoided by bankruptcy proceedings. *N.J.S.A.* 13:1K–12; *see In re Torwico Electronics, Inc.,* 8 *F.*3d

146, 150 n. 4 (3d Cir., 1993), *cert. denied,* 511 *U.S.* 1046, 114 *S.Ct.* 1576, 128 *L.Ed* 2d 219 (1994).

The property at issue is located at 204 Railroad Avenue in Hackensack, and consists of eleven separate tax lots. The property was purchased by Vending Components, Inc. in the late 1930's, and that company used the property as the site for a new facility occupied by its Taprite Products Division, a manufacturer of carbonated beverage dispensing equipment.

On November 7, 1985, Vending Components reached an agreement with Buildex, Inc. (Buildex), to sell to Buildex the property and substantially all of its assets. Later that month, Vending Components submitted documentation to the DEP in which it was asserted that there had been "no known spills or discharges of hazardous substances or wastes" on the property. In that documentation, Vending Components asserted that, "[b]ased on the background information supplied and a site inspection, we feel that no environmental sampling is necessary." *See N.J.A.C.* 7:26B–3.2(d) (repealed) (sampling may be avoided if owner or operator provides fully documented justification). Vending Components informed the DEP that a number of industrial solvents and other chemicals had been used on the premises and that some hazardous substances would remain stored at the site after the sale to Buildex. Vending Components also informed the DEP that the site contained an abandoned well and an abandoned underground oil tank, which was full of oil. The tank had been tested in November 1985 and was found to be "tight."

After receipt of this documentation, an inspector from the DEP's Bureau of Industrial Site Evaluation examined the site. The only deficiency he noted was one inch of oily sludge on the floor of the compressor room. After receipt of his report, the DEP approved Vending Components' negative declaration on January 10, 1986. The approval recognized the presence of "limited quantities of hazardous substances" on the site, but found that the materials were "being handled in accordance with appropriate DEP regulations." The sale to Buildex was completed. Buildex

continued the Taprite operation and renamed the company Taprite Products Corp.

Less than one year later, in April 1986, Taprite Products agreed to sell the property to Railroad Realty Associates (RRA). Taprite submitted the required negative declaration documentation to the DEP. It was substantially similar to that submitted by Vending Components, and indicated that Taprite did not believe that any environmental sampling was necessary. A second inspector from the Bureau of Industrial Site Evaluation examined the site in June 1986 and found no deficiencies. Taprite's negative declaration was approved on September 11, 1986, and RRA assumed ownership of the property shortly thereafter.

RRA altered the property, and in 1989, took in three industrial tenants; two of which utilized solvents containing trichloroethane in their operations.

When it undertook to sell the property in February 1990, RRA found that it had an ECRA problem. The abandoned oil tank failed a precision test, and after its removal, hazardous contaminants including trichloroethane were found in the soil around the excavation site. On April 9, 1990, RRA submitted an application to the DEP for an administrative consent order pursuant to *N.J.A.C.* 7:26C–7.1 to –7.6, which permits an industrial establishment to be sold before ISRA remediation requirements are satisfied, if the seller makes adequate financial assurance that the clean-up will eventually be carried out.

The parties entered into an administrative consent order on May 9, 1990, which required RRA to obtain and post financial assurance in the amount of $250,000. On May 15, 1990, appellant executed and issued to the DEP a performance bond in that amount, assuring RRA's performance under the administrative consent order. RRA then completed the sale of the property.

RRA declared bankruptcy in March 1992, without having met the ISRA clean-up requirements. In December 1993, the DEP declared RRA in default on its remediation obligations under the

administrative consent order and directed appellant to perform under the surety bond. Appellant then made application to the DEP, requesting that the DEP rescind the negative declaration approvals theretofore granted by it to Vending Components and Taprite. On September 25, 1996, the DEP denied appellant's application on the ground that appellant had failed to submit sufficient information to justify rescission. The DEP also informed appellant that it remained responsible for the immediate remediation of the site, and that remediation should not be delayed by litigation between appellant and any previous owners regarding liability for cleanup costs.

Appellant asked the DEP to reconsider its decision on November 16, 1996. On December 10, 1996, the DEP reiterated its decision not to rescind the negative declaration approvals. Appellant filed this appeal as of right from the final DEP decision pursuant to *R.* 2:2–3(a)(2). *See County of Gloucester v. State,* 256 *N.J.Super.* 143, 148, 606 *A.*2d 843 (App.Div.1992) (quoting *Pascucci v. Vagott,* 71 *N.J.* 40, 52, 362 *A.*2d 566 (1976)), *aff'd as modified,* 132 *N.J.* 141, 623 *A.*2d 763 (1993).

On appeal, appellant contends that the DEP's decision to approve the negative declarations without first undertaking groundwater and soil sampling was contrary to the DEP's own regulations, and that the DEP's refusal to rescind the negative declarations was arbitrary, capricious, and unreasonable, and not supported by substantial, credible evidence in the record. In substance, appellant contends that the DEP should either order Vending Components or Taprite to remediate the contamination at the property or act to remediate the site on its own.

The DEP responds that it "has no obligation under the statute ... to rescind negative declaration approvals previously issued or the authority to relieve appellant of its obligations under ISRA." Rescissions of this kind are, according to the DEP, extraordinary relief, which may be granted only in the rarest of circumstances. We agree and affirm.

Appellant relies upon *Chemos Corp. v. State of N.J., Dept. of Environ. Protect.*, 237 *N.J.Super.* 359, 568 *A.*2d 75 (App.Div.1989), and *In re Cadgene Family Partnership*, 286 *N.J.Super.* 270, 669 *A.*2d 239 (App.Div.1995), *certif. denied*, 143 *N.J.* 330, 670 *A.*2d 1070 (1996), in support of its contention that the negative declarations should be rescinded.

In *Chemos,* this court affirmed the DEP's decision to rescind its prior approval of a negative declaration. There, the applicant had requested that it be exempted from ECRA's requirement that a sampling plan be submitted prior to the occurrence of any of the acts which trigger the operation of ECRA or ISRA. The applicant's negative declaration was initially approved, but one month later, the DEP issued a letter rescinding that approval. *Chemos, supra,* 237 *N.J.Super.* at 365, 568 *A.*2d 75. Attached to the rescission letter was a DEP inspector's report issued prior to approval. The inspector had examined the site and found several deficiencies, which were characterized as serious enough to warrant the submission of a sampling plan pursuant to *N.J.A.C.* 7:26B–3.2(c)11 (repealed). *Id.* at 365–66, 568 *A.*2d 75. The DEP claimed on appeal that the rescission served only to correct a ministerial mistake in granting approval of the negative declaration. This court found that the applicant had failed to provide adequate documentation to support its assertion that no sampling was necessary, and that the DEP was within its rights to rescind the approvals as erroneously given. *Id.* at 367, 568 *A.*2d 75.

In *Cadgene,* the seller of an industrial property had affirmatively misrepresented the condition of the property in the documentation it submitted to the DEP in support of its negative declaration. *Cadgene, supra,* 286 *N.J.Super.* at 275–76, 669 *A.*2d 239. The DEP rescinded its initial approval when it learned of the seller's misrepresentations. *Id.* at 277, 669 *A.*2d 239. This court affirmed, holding that the DEP's findings "could reasonably have been reached on sufficient credible evidence present in the record." *Ibid.* (citing *Mayflower Securities v. Bureau of Securities,*

64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973) and *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965)).

The factual distinctions between this case and *Chemos* and *Cadgene* are significant. In each of those cases, negative declarations were rescinded by the DEP because of defects in the approval process. In *Chemos,* the approval was given notwithstanding an inspector's report which affirmatively stated that sampling should be undertaken first. The DEP characterized that action as a ministerial error, since normal procedure would have been to follow the recommendations in the inspector's report. The error was corrected through rescission. *Chemos, supra,* 237 *N.J.Super.* at 365–66, 568 *A.*2d 75. In *Cadgene,* the seller made affirmative misrepresentations in its certifications to the DEP, which led the DEP to approve the negative declaration under false pretenses. Again, the situation was corrected through rescission. *Cadgene, supra,* 286 *N.J.Super.* at 275–77, 669 *A.*2d 239. Here, however, there is nothing in the record to indicate that either Vending Components or Taprite affirmatively misrepresented the environmental condition of the property or that there was a ministerial mistake on the part of the DEP. The inspections carried out prior to each approval found either a minor deficiency or none at all.

■ In light of their executive function, our role in reviewing the actions of State agencies is "severely limited." *In re Musick,* 143 *N.J.* 206, 216, 670 *A.*2d 11 (1996)(citing *Gloucester Cty. Welfare Bd. v. New Jersey Civ. Serv. Comm'n,* 93 *N.J.* 384, 390, 461 *A.*2d 575 (1983)). We may only reverse an agency action if it was clearly inconsistent with the agency's statutory mandate or was "arbitrary, capricious or unreasonable." *Ibid.; Dennery v. Board of Educ. of Passaic Cty. Regional High Sch.,* 131 *N.J.* 626, 641, 622 *A.*2d 858 (1993).

■ We initially find that the DEP issued the negative declaration approvals in accordance with its then-extant regulations. At the time, the DEP regulations required the agency to obtain an environmental sampling plan from any owner or operator of an

industrial property who intended to sell it or shut down a business located on the property. *N.J.A.C.* 7:26B–3.2(c)11 (repealed). However, the DEP did have discretion to approve a negative declaration without environmental sampling, provided that the owner or operator provided a fully documented reason to justify that omission. *N.J.A.C.* 7:26B–3.2(d) (repealed). No standards were then in place to guide the DEP officials as to exactly what would amount to "full documentation." [1] *Chemos, supra,* 237 *N.J.Super.* at 369–70, 568 *A.*2d 75. Accordingly, the record does not disclose that the DEP failed to follow the prevailing law in approving the negative declarations. *Musick, supra,* 143 *N.J.* at 216, 670 *A.*2d 11.

Neither can we agree with appellant's assertion that the DEP acted in an arbitrary or capricious manner in granting the approvals. The approval or rejection of negative declarations is an action which is uniquely within the DEP's province of expertise. *See N.J.A.C.* 7:26B–6.7(a) and (f). The DEP based its decisions upon the information supplied to it by Vending Components, Taprite, and its own inspectors. *See Dennery, supra,* 131 *N.J.* at 641, 622 *A.*2d 858; *Bergen Pines Hosp. v. Department of Human Serv.,* 96 *N.J.* 456, 477, 476 *A.*2d 784 (1984)(holding that agency actions are accorded a presumption of validity which must be overcome by the appellant); *see also IFA Ins. Co. v. New Jersey Dept. of Ins.,* 195 *N.J.Super.* 200, 208, 478 *A.*2d 1203 (App.Div.), *certif. denied,* 99 *N.J.* 218, 491 *A.*2d 712 (1984) (the presumption is even stronger where the agency decision pertains to its inherent expertise). We may not usurp an executive function and decide that the conclusions of the DEP officials with respect to the information provided were clearly erroneous. *See Musick, supra,*

---

[1] Regulations went into effect in 1988 expressly requiring the DEP to obtain sampling results before approving any negative declarations. *N.J.A.C.* 7:26B–4.3(a)(1) (repealed). When Chapter 26B was repealed in its entirety and re-enacted in November 1997, this provision was omitted from the new rules. *Cf. N.J.S.A.* 13:1K–11.1b (providing that the DEP shall investigate negative declaration applications, "if necessary").

143 *N.J.* at 216, 670 *A.*2d 11. Where reasonable minds may differ, an agency's action will not be disturbed if it was undertaken honestly and upon due consideration, even though others might have reached a different conclusion. *In re Visiting Nurse Ass'n of Sussex Cty., Inc.*, 302 *N.J.Super.* 85, 95, 694 *A.*2d 1038 (App. Div.1997) (citing *Worthington v. Fauver*, 88 *N.J.* 183, 204–05, 440 *A.*2d 1128 (1982)).

■ In light of the use and storage of hazardous materials at the site and the presence of an abandoned well and underground oil tank, reasonable minds could differ as to the wisdom of approving the negative declarations without first requiring environmental sampling. We may not now disapprove the DEP's decision in 1986 to grant those approvals. *Ibid.*

■ Appellant additionally contends that the DEP is obligated, as a matter of law, to rescind a negative declaration issued to a former landowner upon the request of a successor, where the DEP seeks to impose environmental remediation costs upon the successor. We hold that the DEP has no such obligation.

The Supreme Court has found that the remediation obligations imposed by ISRA were intended to secure the cleanup of industrial sites at the earliest possible date,

> even if the current owner or operator is not responsible for the contamination. In this sense, the statute focuses on the environmental wrong, not the wrongdoer. *Identification of the polluter plays no part in the ECRA process, which imposes a "self-executing duty to remediate."*
>
> [*In re Adoption of N.J.A.C. 7:26B*, 128 *N.J.* 442, 447–48, 608 *A.*2d 288 (1992) (emphasis added) (quoting *Superior Air Prod. v. NL Ind., Inc.*, 216 *N.J.Super.* 46, 63–65, 522 *A.*2d 1025 (App.Div.1987)).]

■■ The Court's interpretation of the Legislature's intent is supported by ISRA's plain language, which states that an owner or operator of an industrial site is "strictly liable, without regard to fault, for all remediation costs and for all direct and indirect damages resulting from the failure to implement the remedial action workplan." *N.J.S.A.* 13:1K–13a. RRA was the owner of the property when the remedial action workplan was put into effect by means of an administrative consent order, and was

therefore strictly liable to remedy any environmental contamination found on the site. As surety for the now-defunct RRA, appellant has a self-executing duty to perform under the surety bond, irrespective of the fault of prior owners for the environmental conditions on the property. *See Adoption of N.J.A.C. 7:26B, supra,* 128 *N.J.* at 447–48, 608 *A.*2d 288. We place no limitation on appellant's right to seek redress from prior owners of the property. *See Dixon Venture v. Joseph Dixon Crucible Co.,* 235 *N.J.Super.* 105, 110, 561 *A.*2d 663 (App.Div.1989), *aff'd as modified,* 122 *N.J.* 228, 584 *A.*2d 797 (1991).

For the reasons expressed, the final decision of the DEP is affirmed.