759 A.2d 851

FEDERAL PACIFIC ELECTRIC CO., PLAINTIFF–APPELLANT,
v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL
PROTECTION, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 9, 2000—Decided September 22, 2000.

324

Before Judges KESTIN, WEFING and STEINBERG.

*Dennis J. Krumholz* argued the cause for appellant (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Mr. Krumholz,* of counsel and, with *Marilynn R. Greenberg* and *Marcella M. Bodner,* on the brief).

*Karen L. Jordan,* Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.,* Attorney General, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Ms. Jordan,* on the brief).

*Michael L. Rodburg* argued the cause for *amicus curiae* New Jersey Petroleum Council (*Lowenstein Sandler,* attorneys; *Mr. Rodburg* and *Jeffrey B. Gracer,* of counsel, and on the brief with *Tirza S. Wahrman* of the New York bar).

*Reed Smith Shaw & McClay,* attorneys for *amicus curiae* Chemical Industry Council of New Jersey (*Steven J. Picco,* of counsel and, with *Diane Bettino,* on the brief).

*Methfessel & Werbel,* attorneys for *amicus curiae* 2B Environmental, Inc. (*Albert I. Telsey,* on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

In a letter dated July 24, 1997, a section supervisor in the Department of Environmental Protection's (Department) Bureau

of Environmental Evaluation and Cleanup Responsibility Assessment disapproved the groundwater component of Federal Pacific Electric Company's (FPE) remedial action workplan for complying with the requirements of the Industrial Site Recovery Act (ISRA), *N.J.S.A.* 13:1K–6 to –13 (sometimes referred to as S. 1070). FPE then sought to pursue the dispute resolution process mandated in *N.J.S.A.* 58:10B–17. At each of four intermediate steps, the disputed determination was approved or reaffirmed on the merits. The matter then came before the Commissioner who, in a January 30, 1998 letter disposition, stated:

> [E]very case does not offer circumstances which present themselves for dispute resolution. In particular, issues of interpretations of statutes, which are inherently questions of law, do not lend themselves to dispute resolution. It does not appear that there are factual disputes or, in fact, questions of policy contained within the record. Therefore, ... I am satisfied that this particular case does not lend itself to resolution under the dispute resolution process.

From this effective dismissal of its objections to the disapproval of its groundwater cleanup proposal, FPE appeals.

The challenge was initially filed in the Law Division on a complaint for declaratory judgment. The Department moved to transfer the matter to the Appellate Division on the basis of our exclusive jurisdiction over the final decisions or actions of state administrative agencies or officers and over issues implicating the validity of state agency rule promulgations. *See R.* 2:2–3(a)(2). An order transferring the matter was entered, and we denied FPE's subsequent motions to remand the matter to the Law Division for want of a final agency determination and to supplement the record with a toxicologist's affidavit. In other orders, we granted four motions for leave to appear as *amicus curiae*. Three of those *amici* have participated.

In general outline, FPE's appeal is based on two arguments: (1) in rejecting the groundwater component of FPE's workplan as non-compliant with minimum remediation standards, the Department erred because it had failed to adopt the standards applied in accordance with the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to–24; and that the standards used, *i.e.,* the

Groundwater Quality Standards, *N.J.A.C.* 7:9–6.1 to –6.11 (GWQS), and the Technical Requirements for Site Remediation, *N.J.A.C.* 7:26E–1.1 to –7.1 (Technical Rules), violate the pertinent enabling acts; and (2) because the Department had not validly adopted the appropriate standards, it should have addressed FPE's workplan on a case-by-case basis. *Amicus* 2B Environmental, Inc. argues in addition that the Department erred in failing to reclassify the groundwater in the geographic area involved, the Ironbound section of Newark, arguably a "large area[ ] of historic industrial contamination", *N.J.S.A.* 58:10B–12h(2), as required by statute, and that currently applied standards must be invalidated as a result.

Based on FPE's arguments premised upon the requirements of the APA governing rulemakings, *N.J.S.A.* 52:14B–3 to –8, –22 to –24, we reverse and remand for such further proceedings as the Department may elect to undertake between repromulgation of the regulations at issue in conformity with APA requirements or treatment of FPE's workplan on a case-by-case basis.

FPE's remedial action workplan recites an undisputed history. Beginning in the 1860s, a significant portion of the City of Newark primarily comprised of salt marsh was "systematically filled" with "any available materials, including hazardous industrial waste, . . . municipal solid wastes, construction debris, industrial wastes, coal cinders, ash, dredged materials from Newark Bay, as well as clean fill."

From the 1940s to 1983, FPE owned and operated an electric panel manufacturing facility located at 14–16 Herbert Street in the Ironbound area of Newark. The site has a long history of industrial usage reportedly dating back to the nineteenth century, when it was used as a steel foundry. The Ironbound area is a heavily industrialized section of the City, surrounded by major roadways, rail yards, and Newark International Airport. Immediately adjacent to FPE's site are a Conrail rail spur and several industrial operations including a salvage yard, a container compa-

ny, and a barrel cleaning company. Thirty-three environmentally contaminated sites are also located within a one-mile radius.

FPE's manufacturing processes included "painting, plating, cleaning, degreasing, and component assembly and pack-out." In its processes, FPE used trichloroethene (TCE), a chlorinated volatile organic compound (VOC) classified as a probable carcinogen. Raw materials, manufactured goods, and drummed wastes were stored on site.

In 1983, FPE sold the property to a realty company, but continued operations on a leased portion until 1986, when it contracted to sell its assets. That transaction triggered the application of the Environmental Cleanup Responsibility Act (ECRA), the predecessor statute of ISRA at issue here. In June 1986, FPE entered into an administrative consent order with the Department which allowed FPE to sell its assets before ECRA remediation requirements were satisfied. Thereafter, FPE commenced an investigation in accordance with its obligations under the consent order to identify environmental conditions at the site.

In May 1996, FPE submitted a remedial action workplan to the Department in which it reported significant levels of TCE contaminating the groundwater at the site. Sampling by FPE had revealed unacceptably high levels of TCE in groundwater at the downgradient border contrasted with considerably lower levels at the upgradient border.

The workplan noted that although the total volume of TCE used in FPE's manufacturing processes was not known, "spillage into floor trenches in the plating and painting area, where it combined with waste water, is believed to have occurred." The workplan noted further a belief that TCE had been released "to the subsurface ... through leaks in the floor, floor trenches and/or sewer lines and sumps."

FPE's workplan proposed active on-site remediation of groundwater through a recovery well and treatment near the downgradient border until the concentration of TCE or other VOCs leaving

the site reached its "remedial goal" of 50 milligrams per liter (mg/L). The workplan explained that the Department had not adopted minimum remediation standards as mandated by *N.J.S.A.* 58:10B–12, and that FPE had derived its site-specific remedial goal by integrating the findings of scientific studies, risk and exposure assessments, and information on site-specific conditions.

In respect of site-specific conditions, FPE's workplan noted the industrial location and the historic environmental contamination of the area. Given those factors, the workplan concluded that it was "highly unlikely" that the site would be used for anything other than industrial purposes. Additionally, the workplan noted that there were no wells used for drinking water purposes in the vicinity, although three wells were used for fire protection and one had a possible future use as "non-contact cooling water." The conclusion was that groundwater impacted by site operations would not be used for any industrial or potable purposes, currently or in the foreseeable future, and that "no exposure pathways exist between the impacted groundwater ... and any potential human or ecological receptors."

Nevertheless, the workplan examined various hypothetical exposure scenarios by way of "a conservative approach to the assessment of the former FPE leasehold." These hypothetical scenarios included the risk of exposure to an on-site excavation worker and off-site commercial and residential basement contamination. "For each of these exposure scenarios, the potential risks were determined for (a) the maximum ground water concentrations of TCE ... currently observed at the site, (b) ground concentrations equal to the proposed remedial goal of 50 mg/L, which will occur on-site or off-site following remediation, and (c) ground water concentrations predicted to occur on-site or off-site following the completion of the active remediation." The conclusion reached in respect of these hypothetical exposure scenarios was that the concentration of TCE in the groundwater during and after remediation did not pose unacceptable risks.

In developing its risk and exposure assessments, FPE relied upon United States Environmental Protection Agency (USEPA) tables in which "a target risk of one excess cancer in one million is applied to human carcinogens[.]" It concluded that

> [b]ased on the results of both the baseline and post remediation risk assessments, the weight-of-evidence supports the conclusion of no unacceptable risk associated with the relevant exposure scenarios after achievement of the proposed remedial goal. Thus, the proposed remedial goal has been determined to be protective of public health and safety, and the environment.

The Department approved substantially all of FPE's report of the on-site investigation and its proposal for on-site remedial action, but it rejected FPE's "remedial goal" in favor of the considerably more demanding criterion of the GWQS. The Department also advised FPE that it would have to delineate the off-site TCE groundwater plume, and directed it to propose a classification exception area[1] for the groundwater contamination and remediation criteria consistent with the requirements for natural attenuation or to contain the off-site plume. The Department, in its initial determination, explained:

> FPE shall propose remediation criteria that take into consideration such factors as the extent of the plume, biodegradation rates and attenuation rates, etc. If FPE chooses to allow any portion of the plume to naturally be remediated (e.g., through biodegradation), FPE shall submit a natural remediation proposal for the VOC plume that is consistent with *N.J.A.C.* 7:26E–6.3(d) and (e). This proposal shall provide the contaminant concentrations that can be left in the aquifer, along with adequate justification to show that these levels can naturally degrade to the [GWQS] or to background levels. In effect, then, these would be remediation criteria. Any higher contaminant concentrations would have to be actively remediated, even those portions of the plume located off site. If FPE does not submit a natural remediation proposal, FPE shall contain the entire VOC plume (both on site and off site) that exceeds the appropriate remediation criteria.

By letter dated August 18, 1997, FPE requested dispute resolution pursuant to *N.J.S.A.* 58:10B–17, arguing that application of GWQS criteria as the minimum remediation standards was inconsistent with the governing statute, and that the Department was

---

[1] Defined as "an area within which one or more constituent standards and designated uses are suspended in accordance with *N.J.A.C.* 7:9–6.6 [exceptions to the classification system]." *N.J.A.C.* 7:9–6.4.

obligated to adopt minimum standards taking into consideration site-specific factors.

By letter dated August 26, 1997, the Chief of the Department's Bureau of Environmental Evaluation and Cleanup Responsibility Assessment responded that the GWQS were the "primary basis for setting numerical criteria for limits on discharges to ground water and standards for ground water cleanups." The Department maintained that

> FPE is required to delineate and remediate contamination emanating from the FPE property to the applicable GWQS to receive an approval of the RAW [remedial action workplan]. The CEA [classification exception area] and natural attenuation policies are important but are not the only components responding to the policies of S. 1070. The Department's regulations taken as a whole, including the Technical Rules, and the review of remedial plans adequately address the site-specific factors and specific criteria provided in S. 1070 and other applicable statutes. Under the site-specific conditions at FPE, the Department does not foresee that active remediation of the entire plume will be required. However, appropriate source control/removal and remediation plan for the entire plume migrating from the FPE site remains a minimum requirement.

The Assistant Director of Industrial Site Evaluation Element affirmed this position by letter dated September 15, 1997, noting that the Department "continues to maintain that FPE is required to delineate and remediate contamination emanating from the FPE property to the applicable GWQS to receive an approval of the RAW." Similar determinations were subsequently made by the Director of the Division of Responsible Party Site Remediation and the Assistant Commissioner in charge of the Site Remediation Program. Following these determinations, the Commissioner declined to review the matter on the grounds set forth above.

FPE and the *amici* argue that the Department erred in rejecting the groundwater component of the remedial action workplan on the basis that FPE did not comply with minimum remediation standards. FPE contends the Department failed to adopt minimum remediation standards in accordance with the APA, and that the applicable statutes do not authorize the Department's use of the standards embodied in the GWQS and the Technical Rules for application in the instant circumstances.

New Jersey was one of the first states to enact legislation confronting its environmental problems. In 1976, the Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 to –23.24, was enacted to establish standards and mechanisms regarding the cleanup of hazardous discharges. *See N.J.S.A.* 58:10–23.11f(a)(1) and 23.11q. Thereafter, the federal government enacted the Comprehensive Environmental Response, Compensation, and Liability Act, 42 *U.S.C.A.* §§ 9601–9675.

Meanwhile, in 1977, New Jersey enacted the Water Pollution Control Act (WPCA), *N.J.S.A.* 58:10A–1 to –60, "to restore, enhance and maintain the chemical, physical, and biological integrity of its waters, to protect public health, to safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial and other uses of water." *N.J.S.A.* 58:10A–2.

At the same time, the Department adopted the GWQS under the authority of WPCA and the Water Quality Planning Act, *N.J.A.C.* 58:11A–1 to –16, to protect the ground water resources of the Pine Barrens. *N.J.A.C.* 7:9–6.1 to –6.11. In 1981, the Department promulgated an amendment to the GWQS which expanded those standards to encompass the entire State. Three general classifications of groundwater were established: 1) groundwater of special ecological significance (Class I); 2) groundwater for potable water supply (Class II); and 3) groundwater with uses other than potable water supply (Class III). *N.J.A.C.* 7:9–6.5. The 1981 GWQS applied "to the establishment of pollutant limitations and other requirements applicable to those discharger activities that cause pollutants to enter the ground waters of the State." *N.J.A.C.* 7:9–6.1(b) (prior to amendment). No numeric quality standards were provided for TCE.

In 1983, New Jersey enacted ECRA to provide for the expeditious cleanup of contaminated industrial sites upon their sale, closure, or transfer. *N.J.S.A.* 13:1K–6 (prior to amendment). ECRA required that the Department adopt minimum standards for groundwater quality. *N.J.S.A.* 13:1K–10a; *Chemos Corp. v.*

*State Dep't. of Envtl. Protection, Div. of Hazardous Waste Management,* 237 *N.J.Super.* 359, 368, 568 *A.2d* 75 (App.Div.1989).

In 1992, the Department proposed "Cleanup Standards for Contaminated Sites," including minimum remediation standards for groundwater. 24 *N.J.R.* 319, 373(a), 389 (February 3, 1992). However, during a legislative hearing, the Commissioner stated that the Department had withdrawn these proposed standards to allow for legislative input, and because of the "extraordinary number of comments" received regarding the proposal. Public Hearing before Senate Environment Committee, p. 5 (January 26, 1993).

Effective February 1, 1993, the Department readopted the GWQS with amendments, providing

> the basis for protection of ambient ground water quality, through the establishment of constituent standards for ground water pollutants. These constituent standards are applicable to the development of: ground water protection standards pursuant to the New Jersey Pollutant Discharge Elimination System ...; ground water cleanup standards and compliance levels beyond the boundaries of a contaminated site pursuant to applicable regulatory programs; and other requirements and regulatory actions applicable to discharges that cause or may cause pollutants to enter the ground waters of the State, including nonpoint and diffuse sources regulated by the Department. Other relevant laws through which the Ground Water Quality Standards may be applied include, but are not limited to, the Spill Compensation and Control Act ..., the Solid Waste Management Act ..., [and] the Environmental Cleanup Responsibility Act....
>
> [*N.J.A.C.* 7:9–6.1(b).]

These standards were designated as "the Department's primary basis for setting numerical criteria for limits on discharges to ground water and standards for ground water cleanups." *N.J.A.C.* 7:9–6.1(c). The adoption also expanded the numerical water quality standards, which were based upon the recommendations of the Safe Drinking Water Quality Institute, to include criteria for additional contaminants, including a one-part-per-billion (ppb) standard for TCE.

Effective June 16, 1993, ECRA was amended by S. 1070 and renamed ISRA, *see N.J.S.A.* 13:1K–6 (West Supp.2000), in response to criticism that the complicated program had stagnated the transfer of contaminated property and had created other

problems. *See* Senate Environment Committee statement on S. 1070 (March 15, 1993). The Legislature found

> that discharges of toxic chemicals dating back to early industrialization have left a legacy of contaminated industrial property in this State; that in 1983, due to the growing public awareness and concern of the risks to the public health and the environment and the potential costs to the State to clean up abandoned contaminated sites, [ECRA] was enacted. The Legislature also finds that the act's imposition of a cleanup plan approval before the transfer or upon the closing of an industrial establishment and the requirement to establish a funding source for the cleanup are in the general public interest by ensuring the discovery of contamination, by assuring that funding for cleanup is set aside at the time it is available from a transfer or closing, and by assuring that contaminated property is not abandoned to the State for cleanup. The Legislature further finds that at the time of the act's passage, the extent of the State's industrial contamination and the cost and complexity of remediations were not well understood; that in the intervening years, there has been a significant advance in the body of knowledge concerning how to remediate contaminated sites effectively and how to manage the remediation efficiently; that the regulated and financial communities are now more familiar with the liabilities involving contaminated property and with the necessity to discover and remediate that contamination; and that it is in the interest of the environment and the State's economic health to promote certainty in the regulatory process by incorporating that knowledge to create a more efficient regulatory structure and to allow greater privatization of that process where it is possible to do so without incurring unnecessary risks to the public health or the environment.

> The Legislature therefore declares that it is the policy of this State to protect the public health, safety, and the environment, to promote efficient and timely cleanups, and to eliminate any unnecessary financial burden of remediating contaminated sites; that these policies can be achieved by streamlining the regulatory process, by establishing summary administrative procedures for industrial establishments that have previously undergone an environmental review, and by reducing oversight of those industrial establishments where less extensive regulatory review will ensure the same degree of protection to public health, safety, and the environment; and that the new procedures established pursuant to this act shall be designed to guard against redundancy from the regulatory process and to minimize governmental involvement in certain business transactions.

> [*N.J.S.A.* 13:1K–7.]

Under ISRA the Department was again directed to adopt rules and regulations establishing:

> (1) criteria and minimum standards necessary for the submission, evaluation and approval of plans or results of preliminary assessments, site investigations, remedial investigations, and remedial action workplans and for the implementation thereof. . . .

> [*N.J.S.A.* 13:1K–10(a).]

The same bill, S. 1070, also enacted the Hazardous Discharge Site Remediation Act, a new chapter in the water pollution statutes covering hazardous discharge site remediation, which was thereafter amended and renamed the Brownfield and Contaminated Site Remediation Act (Brownfield Act). *N.J.S.A.* 58:10B–1.2. The Legislature found and declared

> that due to New Jersey's industrial history, large areas in the State's urban and suburban areas formerly used for commercial and industrial purposes are underused or abandoned; that many of these properties, often referred to as brownfields, are contaminated with hazardous substances and pose a health risk to the nearby residents and a threat to the environment; and that these sites can be a blight to the neighborhood and a financial drain on a municipality because they have no productive use, and fail to generate property taxes and jobs. The Legislature further finds that often there are legal, financial, technical, and institutional impediments to the efficient and cost-effective cleanup of brownfield sites as well as all other contaminated sites wherever they may be. The Legislature finds and declares that the State needs to ensure that the public health and safety and the environment are protected from the risks posed by contaminated sites and that strict standards coupled with a risk based and flexible regulatory system will result in more cleanups and thus the elimination of the public's exposure to these hazardous substances and the environmental degradation that contamination causes.
>
> The Legislature therefore declares that strict remediation standards are necessary to protect public health and safety and the environment; that these standards should be adopted based upon the risk posed by discharged hazardous substances; that unrestricted remedies for contaminated sites are preferable and the State must adopt policies that encourage their use; that institutional and engineering controls should be allowed only when the public health risk and environmental protection standards are met; and that in order to encourage the cleanup of contaminated sites, there must be finality in the process, the provision of financial incentives, liability protection for innocent parties who clean up, cleanup procedures that are cost effective and regulatory action that is timely and efficient.
>
> [*N.J.S.A.* 58:10B–1.2.]

### The Brownfield Act also provided that the Department

> shall adopt minimum remediation standards for soil, groundwater, and surface water quality necessary for the remediation of contamination of real property. The remediation standards shall be developed to ensure that the potential for harm to public health and safety and to the environment is minimized to acceptable levels, *taking into consideration the location, the surroundings, the intended use of the property, the potential exposure to the discharge, and the surrounding ambient conditions, whether naturally occurring or man-made.*
>
> *Until the minimum remediation standards* for the protection of public health and safety as described herein *are adopted, the department shall apply* public health

and safety remediation *standards* for contamination at a site *on a case-by-case basis* based upon the considerations and criteria enumerated in this section.

[*N.J.S.A.* 58:10B–12(a) (emphasis supplied).]

### The Department was instructed to:

(1) base the standards on generally accepted and peer reviewed scientific evidence or methodologies;

(2) base the standards upon reasonable assumptions of exposure scenarios as to amounts of contaminants to which humans or other receptors will be exposed, when and where those exposures will occur, and the amount of that exposure;

(3) avoid the use of redundant conservative assumptions . . .;

(4) where feasible, establish the remediation standards as numeric or narrative standards setting forth acceptable levels or concentrations for particular contaminants; and

(5) consider and utilize, in the absence of other standards used or developed by the Department of Environmental Protection and the United States Environmental Protection Agency, the toxicity factors, slope factors for carcinogens and reference doses for non-carcinogens from the United States Environmental Protection Agency's Integrated Risk Information System (IRIS).

[*N.J.S.A.* 58:10B–12(b).]

Meanwhile, in May 1992, the Department had proposed the Technical Rules "to establish the Department's rules on the remediation of contaminated sites in New Jersey" including sites subject to ECRA. 25 *N.J.R.* 2151, 2281(b) (June 7, 1993); *N.J.A.C.* 7:26E–1.1(a); *N.J.A.C.* 7:26E–1.3(a)(1). The proposal defined "applicable remediation standard" to mean

the numeric standard to which contaminants must be remediated for soil, ground water or surface water, or other environmental media, [to allow for a specified site use,] as provided by the Department pursuant to rule, including without limitation the Ground Water Quality Standards, *N.J.A.C.* 7:9–6, and Surface Water Quality Standards, *N.J.A.C.* 7:9–4, or as determined by the Department on a case by case basis.

[25 *N.J.R.* 2151, 2281, 2441 (June 7, 1993).] [2]

---

[2] *N.J.A.C.* 7:26E–1.8 now defines "applicable remediation standard" as "the numeric or narrative standard to which contaminants must be remediated for soil, ground water or surface water, . . . to allow for a specified site use, as provided by the Department pursuant to rule, including without limitation the Ground Water Quality Standards, *N.J.A.C.* 7:9–6, the New Jersey State Surface Water Quality Standards, *N.J.A.C.* 7:9B, and the Federal Surface Water Quality Criteria, 40 *C.F.R.* Part 131, or site specific remediation standards as determined by the Department on a case by case basis."

As far as we can discern, however, the criteria contained in the proposal were not meant to constitute remediation standards because in response to comment 55 received from the public after the notice period, the Department noted it would "propose remediation standards in the near future." *Id.* at 2289. The Department declared an intention to apply remediation standards "on a case-by-case basis" in the meantime. *Ibid.* At the time the Department's responses were published, S. 1070 had been unanimously approved by the Senate and was pending in the General Assembly.

In 1995, the Department readopted the GWQS. 27 *N.J.R.* 3515, 3519 (September 18, 1995). In its regulatory summary, the Department did not mention S. 1070, stating instead that the regulations served "the purpose for which they were originally promulgated." *Ibid.* The regulatory summary also stated that

[t]he Ground Water Quality Standards are utilized in Departmental regulatory activities within the Environmental Regulation and Site Remediation programs. Examples include determination of effluent limitations and ground water quality constituent standards through NJPDES [New Jersey Pollutant Discharge Elimination System] Discharge to Ground Water permits, and remedial requirements through programs for the cleanup of hazardous waste sites. This subchapter will be revised in the future to update of [sic] human health based ground water quality criteria.

[*Ibid.*]

In 1996, the Department published the proposed readoption of the Technical Rules in which S. 1070 was cited as a statutory authority. 28 *N.J.R.* 1093, 1098 (February 20, 1996). The Department received 1,131 comments and held a public hearing. 29 *N.J.R.* 2197, 2278(b) (May 19, 1997). FPE did not comment on the Technical Rules nor did it appeal from the readoption of the regulations. A challenge to the Technical Rules was filed by several other entities, however, including *amicus* New Jersey Petroleum Council. The rules were upheld on April 17, 2000, in our unpublished opinion in *New Jersey Site Remediation Indus. Network v. Department of Envtl. Protection,* A–5272–97T3.

In responses to one statement filed during the rule-promulgation comment period, the Department noted:

Decisions regarding the need to remediate ground water in the State of New Jersey are determined based on a variety of statutes, including *N.J.S.A.* 58:10–1 et seq., 58:10A–1 et seq. [WPCA] and 58:10B–1 et seq. [Brownfield Act], as well as the Ground Water Quality Standards, *N.J.A.C.* 7:9–6. The Ground Water Quality Standards are human health based criteria. These standards, which are based on regional classifications of ground water, do not recognize actual uses of ground water, and represent the basis for remediating ground water [if] the State of New Jersey . . . allows for modification of site specific constituent standards based on background water quality.

Nothing in [the Remediation Act] exempts the person responsible for conducting the remediation from the requirements of *N.J.S.A.* 58:10–23.11 or 58:10A–1 et seq., including requiring that ground water contamination achieves specific narrative and numerical standards that "restore, enhance and maintain the chemical, physical, and biological integrity of its waters, to protect public health, to safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial and other uses of water." (*N.J.S.A.* 58:10A–2).

[29 *N.J.R.* 2197, 2278, 2286, 2334–35 (May 19, 1997).]

With respect to another comment directed at the definition of remediation standards, the Department responded:

The Department expanded the definition of "remediation standard" from S. 1070 to form the definition of "applicable remediation standard" to clarify the term as it relates to different environmental media within the rule. The Department disagrees that the Technical Rules' definition conflicts with the definition provided in the Ground Water Quality Standards. It appears that the commenter has misinterpreted statements contained in the basis and background for the Ground [W]ater Quality Standards, N.J.A.C. 7:9–6.1. The Department's reference to the Ground [W]ater Quality Standards is appropriate within the definition of "applicable remediation standard." The Ground [W]ater Quality Standards are to be achieved throughout the aquifer and not just at the boundary of a contaminated site. The Department believes that the commenter is referring to the perimeter of a Classification Exception Area which is a special circumstance noted within the referenced standards.

[*Id.* at 2302.]

Regarding the economic effect of the Technical Rules, the Department responded:

The Department fully supports the cost effective environmentally sound redevelopment of Brownfield sites. The Department has been a leader in the development of differential standards to allow for more reasonable remediation standards to be implemented on industrial sites. The Department has also been a leader in the development of one of the first voluntary cleanup programs in the country to encourage and streamline the process of remediating the Brownfield sites. To date, over 3,000 voluntary cleanups have occurred.

[*Id.* at 2287.]

And a comment regarding natural remediation elicited the following response:

The Department does not use arbitrary numbers to determine if natural remediation of ground water or soil is an appropriate remedy. The premise behind natural remediation is that natural processes will cause contamination in soil or ground water to be reduced below concentrations of concern before the contamination reaches another receptor. Therefore, a numeric criterion must still be the basis for evaluation. The Department does not believe that the requirements for natural remediation are too restrictive and unnecessarily limit the use of natural remediation. In fact, the Department has approved numerous natural ground water remediation plans. The requirements for natural remediation are necessary to assure protection of human health and the environment. As stated above, the person responsible for conducting the remediation has the option of either using the soil cleanup criteria and the Ground Water Quality Standards, which do not contain arbitrary numbers, or developing alternate, site-specific cleanup standards as the applicable standard for the site.

[*Id.* at 2288.]

Thereafter, on July 2, 1999, the Department adopted amendments to the Technical Rules, again listing S. 1070 as authority. Among other changes, those amendments added groundwater to the definition of environmentally sensitive areas. *N.J.A.C.* 26E:1.8; 31 *N.J.R.* 2019, 2167, 2179–80 (August 2, 1999). The Department responded to a comment as follows:

Not only is ground water important as a potable drinking water source, particularly in times of drought emergencies, but also in its role as an integral part of the ecosystems of this State. For example, some of the important ecological services that ground water provides including [sic] the cycling and movements of nutrients, surface water recharge, prevention of saltwater intrusion, ground stabilization and the prevention of sinkholes, maintenance of critical water levels in freshwater wetlands, as well as other ecosystem management functions. In addition, there are human uses of ground water other than drinking water, including irrigation for agriculture, heated water for geothermal plants, cooling water for other power plants, and other industrial uses. Furthermore, "[g]iven the dense population and industrialization of the State, reduced ground water recharge and potential or [sic] contamination of this resource are of great concern and increase the need for its protection. * * *

Thus, even ground water that is not presently used as a drinking water source, discharges to that ground water can cause natural resource injuries. In order to ensure that a site is fully remediated, the Department has determined that it is necessary to evaluate whether discharges to ground water have resulted in natural resource injuries. If so, these injuries must be assessed and restored as part of the remediation of contaminated sites.

[*Id.* at 2180.]

FPE argues that the Department failed to comply with the notice provision of the APA because it did not set forth that the GWQS and Technical Rules were to constitute the minimum remediation standards under S. 1070. *Amici* Petroleum Council and 2B Environmental argue additionally that the Department failed to comply with the federal standards review requirements of the APA, *N.J.S.A.* 52:14B–22 to–24.

Generally, if an entity does not participate in the administrative proceedings leading up to the promulgation of regulations, it will not be permitted to obtain direct judicial review of the regulations. *Bergen Pines County Hosp. v. New Jersey Dep't of Human Servs.*, 96 *N.J.* 456, 474–75, 476 *A.2d* 784 (1984). But where a challenge involves issues of public interest, the general rule will not be applied. *Cf. Southern New Jersey Newspapers, Inc. v. Township of Mount Laurel*, 275 *N.J.Super.* 465, 473–74, 646 *A.2d* 510 (App.Div.1994) (considering the validity of a regulation notwithstanding the plaintiff's failure to address adoption of the regulation by direct appeal), *aff'd as modified*, 141 *N.J.* 56, 660 *A.2d* 1173 (1995). For that reason, and because this case involves a question of sufficient notice and application of the standard embodied in a regulation, we will address the challenge.

Administrative rules are not valid unless adopted "in substantial compliance" with the APA. *N.J.S.A.* 52:14B–4(d); *Woodland Private Study Group v. State Dep't of Envtl. Protection*, 109 *N.J.* 62, 63–64, 533 *A.2d* 387 (1987). The APA provides that prior to the adoption, amendment or repeal of any rule, an agency shall provide notice of "the terms or substance" of its intended action. *N.J.S.A.* 52:14B–4(a)(1). The agency must also:

> [p]repare for public distribution at the time the notice appears in the [New Jersey] Register a statement setting forth a summary of the proposed rule, a clear and concise explanation of the purpose and effect of the rule, the specific legal authority under which its adoption is authorized, [and] a description of the expected socio-economic impact of the rule....
>
> [*N.J.S.A.* 52:14B–4(a)(2).]

"Where rule-making is concerned, the purpose of the procedure set forth in the A.P.A. is to give those affected by the

proposed rule an opportunity to participate in the rule-making process not just as a matter of fairness but also as 'a means of informing regulators of possibly unanticipated dimensions of a contemplated rule.' " *In re the Adoption of Regulations Governing Volatile Organic Substances in Consumer Prods., N.J.A.C. 7:27–23,* 239 *N.J.Super.* 407, 411, 571 *A.*2d 971 (App.Div.1990) (quoting *American Employers' Ins. v. Commissioner of Ins.,* 236 *N.J.Super.* 428, 434, 566 *A.*2d 202 (App.Div.1989)).

Although initially proposed in 1992, the development of cleanup standards has been an unfulfilled legislative mandate since ECRA was first adopted, thereby subjecting the Department to criticism. *Avon Prods., Inc. v. New Jersey Dep't of Envtl. Protection,* 243 *N.J.Super.* 375, 380, 579 *A.*2d 831 (App.Div.1990) (criticizing the Department's failure to promulgate standards); *Chemos Corp. v. State Dep't of Envtl. Protection,* 237 *N.J.Super.* 359, 370, 568 *A.*2d 75 (App.Div.1989) (explaining that promulgation of the standards would have enabled both parties to understand what was required). Here, the Department contends it has applied previously promulgated regulations, the GWQS and the Technical Rules, as its minimum remediation standards for groundwater even in situations such as that presented here.

We note, however, that the GWQS were originally adopted in 1977 and readopted in February 1993, prior to the enactment of S. 1070, to provide the Department's "primary basis for setting numerical criteria for limits on discharges to ground water and standards for ground water cleanups." *N.J.A.C.* 7:9–6.1(c). Yet, there is no reference in S. 1070 to support the contention that the GWQS were intended to satisfy the requirement for minimum remediation standards in all instances. The Department was, however, permitted to "develop differential remediation standards for surface water or groundwater that take into account the current, planned, or potential use of that water in accordance with the 'Clean Water Act' [33 *U.S.C.A.* §§ 1251 to 1387] and the 'Water Pollution Control Act,' " the enabling statute for the GWQS. *N.J.S.A.* 58:10B–12(c)(2).

The Technical Rules were proposed in 1992 "to establish the Department's rules on the remediation of contaminated sites in New Jersey." 25 *N.J.R.* 2151, 2281(b) (June 7, 1993). In these rules the Department provided for procedures under which the remediating party would describe possible risks and injuries to the environment, but did not quantify what amounts of which contaminants would be considered as natural resource damage needing remediation or restoration. In fact, the Department specifically noted in its response to comments that the Cleanup Rules had not been adopted, but that it intended to propose remediation standards "in the near future." *Id.* at 2289.

Thereafter, in 1996, the Technical Rules were amended by a formal rule proposal. 28 *N.J.R.* 1093, 1098 (February 20, 1996). At that time the Department listed S. 1070 as statutory authority for the proposed readoption. *Ibid.* Yet, the substantive changes that were adopted at that time primarily related to remediation standards for soil, not groundwater, and there is no indication in the summary that the proposed rule would establish generally the minimum remediation standards for groundwater. *Id.* at 1098–99. Nevertheless, at least two of the commentators understood that the GWQS were to be used as remediation standards under S. 1070. *Id.* at 2286, 2302.

■ We hold that the Department violated the APA in failing to provide notice of the applicable standards by way of "a clear and concise explanation" in its summary that these regulations either separately or collectively, were to serve as the groundwater remediation standards pursuant to S. 1070. *N.J.S.A.* 52:14B–4(a)(2). Such an explanation was especially important here where the Department relied upon previously promulgated regulations which had not served as the applicable remediation standards under either ECRA or ISRA; thus, the readoption of those regulations would not have alerted an interested party to the change. That a few who commented appear to have understood the fuller impact of the regulations does not mitigate the notice deficiency. Given the express legislative directive to promulgate

remediation standards and the impact of the standards, the failure to give adequate notice violates the requirements and policies of the APA. If the standards are to be so applied, they must be republished in conformity with the APA, generating opportunity for well-informed comment and the possibility that the standards will be modified after the comments received are analyzed and digested. Absent such action, the Department is required to deal with FPE's matter on a case-by-case basis as required by *N.J.S.A.* 58:10B–12(a).

Even the presumption of validity generally applied to rule promulgations does not serve to validate the rules application upon which the agency relies in this case. The Department's responses to various comments at various times stated positions quite different from the arguments offered in this appeal, creating a misimpression of the thrust of the proposed rules in groundwater remediation. The affected public may rightly be taken to have relied upon the responses provided. Moreover, the rules themselves and any explanation appended thereto are bereft of any inherent logic in applying the GWQS to this situation in the same way as those standards would be applied in other circumstances; and the Department's reasons for rejecting the groundwater component of FPE's remedial action workplan contain no basis for applying different remediation needs here than those proposed.

The notice and comment requirements of the APA are not to be lightly applied or regarded as obstacles to be avoided. They are designed to serve the cause of fairness by providing a mechanism for informing the affected public adequately of the operation and impact of proposed administrative rules and regulations which, in these times, govern so much of our day-to-day existence. The application of the rules at issue here to FPE's groundwater remediation proposal is in derogation of the policies underlying those requirements.

*Amici* Petroleum Council and 2B Environmental argue that the Department failed to comply with the federal standards review requirement of the APA which provides, *inter alia,* that, after

June 5, 1995, an administrative agency which adopts, readopts or amends a rule or regulation described in *N.J.S.A.* 52:14B–24, shall

in addition to all the requirements imposed by existing law and regulation, include as part of the initial publication and all subsequent publications of such rule or regulation, a statement as to whether the rule or regulation in question contains any standards or requirements which exceed the standards or requirements imposed by federal law.

[*N.J.S.A.* 52:14B–23.]

In readopting the GWQS in September 1995, the Department set forth that there were no "standards or requirements which exceed those required by Federal law." 27 *N.J.R.* 3515, 3520–21 (September 18, 1995). Similarly, in readopting and amending the Technical Rules the Department declared it had

determined that, with the exception of provisions that are described below, the Technical Rules and these proposed amendments do not require any specific action that is more stringent than any requirement of comparable Federal law. This readoption with amendments is not comparable to Federal rules. The implementing regulations for the Federal laws listed above provide only generic procedural requirements on how to investigate and clean up contaminated sites. Unlike the Technical Rules, the Federal regulations do not specify minimum requirements on how to conduct investigations of soil, ground water, surface water and sediments.

[28 *N.J.R.* 1093, 1112 (February 20, 1996).]

*Amici* argue that the rules at issue here are nevertheless more stringent than pertinent federal rules because the USEPA's maximum contaminant level for TCE in drinking water is 5 ppb as opposed to the 1 ppb standard set by the Department. *See* 40 *C.F.R.* § 141.61(a)(5) (1999).

■ We consider these arguments advanced by *amici* to be within the scope of FPE's appeal, and we conclude that the Department complied with the federal standards review requirement in readopting both the Technical Rules and the GWQS because it included a written statement, and because there are no federal groundwater standards. Further, the Department set forth the differences between federal and state drinking water standards in the adoption of its drinking water regulations, *see* *N.J.A.C.* 7:10–1 to –15.5; 27 *N.J.R.* 4037, 4064 (November 6, 1995), including an explanation for why the State standards in this

regard are more stringent than the federal standards. *Id.* at 4071–72.

In the light of our determination that the challenged standards must be repromulgated before they can be validly applied to FPE's proposed remediation, and in the face of our earlier determination in the *New Jersey Site Remediation Indus. Network* case upholding the rules promulgation there challenged, we need not, in order to resolve the precise issues before us, address FPE's arguments that the rules upon which the action challenged herein is predicated violate, in various ways, the enabling act's legislative purpose and mandates regarding the adoption of minimum remediation standards.

Additionally, it is clear from the record before us that because the Department's determination at issue here was based upon the premise that the rules it invoked could be validly applied to FPE's proposed remediation, the Department did not proceed on the case-by-case basis required by *N.J.S.A.* 58:10B–12(a).

█ Finally, *amicus* 2B Environmental advances an argument concerning the Department's responsibilities regarding reclassification of the Ironbound section of Newark with regard to remedial requirements. This is an issue not raised by the parties, and we will not consider it. An *amicus curiae* may not interject new issues, but must accept the issues as framed and presented by the parties. *Bethlehem Tp. Bd. of Educ. v. Bethlehem Tp. Educ. Ass'n,* 91 *N.J.* 38, 48–49, 449 *A.*2d 1254 (1982); *Saul v. Midlantic Nat'l Bank/S.,* 240 *N.J.Super.* 62, 81, 572 *A.*2d 650 (App.Div.1990), *certif. denied,* 122 *N.J.* 319, 585 *A.*2d 338 (1990).

The Department's disapproval of the groundwater component of FPE's remedial action workplan is reversed, and the matter is remanded for further proceedings consistent with this opinion.