47 A.3d 25

DES CHAMPS LABORATORIES, INC., APPELLANT, v. ROBERT MARTIN, COMMISSIONER, NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT.

R & K ASSOCIATES, LLC, INTERVENOR.

Superior Court of New Jersey
Appellate Division

Argued December 12, 2011—Decided July 6, 2012.

Before Judges SABATINO, ASHRAFI, and FASCIALE.

*Daniel L. Schmutter* argued the cause for appellant (*Greenbaum Rowe Smith & Davis, LLP*, attorneys; *Mr. Schmutter, Jack Fersko* and *Jay A. Jaffe*, on the brief).

*Kimberly A. Hahn*, Deputy Attorney General, argued the cause for respondent (*Paula T. Dow*, Attorney General, attorney; *Lewis A. Scheindlin*, Assistant Attorney General, of counsel; *Ms. Hahn*, on the brief).

*John M. Scagnelli* argued the cause for intervenor (*Scarinci & Hollenbeck, LLC*, attorneys; *Mr. Scagnelli*, of counsel and on the brief; *William A. Baker* and *Kathleen J. Devlin*, on the brief).

The opinion of the court was delivered by

SABATINO, J.A.D.

This appeal raises the question of whether the Industrial Site Recovery Act of 1993 ("ISRA"), *N.J.S.A.* 13:1K–6 to –14, the Site Remediation Reform Act of 2009 ("SRRA"), *N.J.S.A.* 58:10C–1 to –29, or any other statute authorizes the Department of Environmental Protection ("the Department" or "the DEP") to impose certain disputed obligations upon the owners or operators of industrial establishments that stored or handled small quantities of hazardous substances, as a condition of obtaining a so-called "de minimis quantity exemption" ("DQE") from ISRA requirements.

In particular, the appeal implicates the validity of regulatory provisions within *N.J.A.C.* 7:26B–5.9, most recently amended by the Department in May 2012. Those provisions require an applicant for a DQE to certify, to the best of the applicant's knowledge, that the property where the de minimis quantities had been present is now "clean," i.e., not contaminated above levels established by the Department. The appeal also calls into question the validity of related provisions within *N.J.A.C.* 7:26B–5.9 that require such applicants to remediate the property if the Department disapproves their DQE application and the application is not withdrawn.

For the reasons that follow, we conclude that the Department presently lacks the statutory authority to require DQE applicants to certify that they believe their property is not contaminated. The imposition of such an obligation as a condition of DQE approval is inconsistent with ISRA and SRRA, statutes which are designed, among other things, to streamline the regulatory process and, as ISRA proclaims, "minimize governmental involvement in certain business transactions." *N.J.S.A.* 13:1K–7.

Consequently, we invalidate the regulatory provisions in question and reverse the Department's final agency decision insofar as it denied appellant's application for a DQE based upon the unauthorized condition. We do so without prejudice to the Department's potential ability to seek a cleanup of the industrial site under other environmental statutes and regulations that are not tied to the DQE approval process.

## I.

From 1982 through 1996, appellant Des Champs Laboratories, Inc.,[1] operated an industrial establishment on Okner Parkway in

---

[1] Des Champs Laboratories, Inc., has since merged with a successor company, Munters Corporation. We nevertheless shall treat Des Champs Laboratories, Inc. as the "applicant" and "appellant," consistent with the captions of the parties' briefs and appendices and the administrative record.

Livingston. Appellant used the property for the light assembly of heat recovery ventilators sold primarily in the residential market. During that fourteen-year period of operation, appellant's President, Nicholas Des Champs, and his wife, Rebecca Des Champs, owned the property.

In November 1996, appellant's environmental consultant submitted to the Department a General Information Notice [2] and a Preliminary Assessment Report.[3] ISRA required appellant to file these submissions in anticipation of appellant terminating its operations at the Livingston site. *See N.J.S.A.* 13:1K–9. Appellant also submitted, in connection with its planned cessation of operations, a "negative declaration" affidavit [4] to the Department in January 1997. In that affidavit, Mr. Des Champs certified that, "there have been no discharge(s) of hazardous substances or hazardous wastes from the industrial establishment[.]"

The Department subsequently issued appellant a "no further

---

[2] *See N.J.A.C.* 7:26B–3.2 (explaining in the current regulations that an owner or operator that plans to close operations or transfer ownership or operations of an industrial establishment is required to complete a General Information Notice within five calendar days of certain specified events relating to the planned closure or transfer).

[3] *See N.J.A.C.* 7:26E–3.1 (describing in the current regulations the "preliminary assessment" needed "to determine whether contaminants are or were present at a site or have migrated or are migrating from a site and thus whether additional remediation is necessary ... due to the presence of any potentially contaminated areas of concern"); *see also N.J.A.C.* 7:26B–1.4 (defining certain related terms in the current regulations); *N.J.A.C.* 7:26E–1.8 (defining additional related terms in the current regulations).

[4] *N.J.S.A.* 13:1K–8 defines a "negative declaration" as "a written declaration, ... to the department, certifying that there has been no discharge of hazardous substances or hazardous wastes on the site, or that any such discharge on the site or discharge that has migrated or is migrating from the site has been remediated[.]" *But see* 43 *N.J.R.* 1935(a), 1942, 1994 (Aug. 15, 2011) and *N.J.A.C.* 7:26B–1.4 (as revised eff. May 7, 2012) (noting that the Department apparently has since discontinued the use of negative declarations). We have not been asked to address this apparent disparity with the statute.

action" letter[5] on January 22, 1997, thereby authorizing the cessation of operations. Later that same year, Mr. and Mrs. Des Champs sold the property to its current owner, intervenor R & K Associates, LLC ("R & K").

Eight years later, beginning in October 2005, the Department investigated the potential source of groundwater contamination that had been reported in Livingston. The investigation indicated to the Department that the source of the Livingston contamination had originated in the middle of appellant's former property at Okner Parkway.[6] As a result of that information, the Department issued appellant a letter on November 10, 2008, rescinding its January 22, 1997 "no further action" letter. The November 10, 2008 letter informed appellant that because of the rescission, appellant "no longer ha[d] the required authorization that allowed the sale of property to occur in 1997."

---

[5] *N.J.A.C.* 7:26B–1.4 defines a "no further action letter" in the current regulations as

> a written determination by the Department that, based upon an evaluation of the historical use of the industrial establishment, or of an area of concern or areas of concern, as applicable, and any other investigation or action the Department deems necessary, there are *no discharged hazardous substances or hazardous wastes present* at the industrial establishment or area(s) of concern, or any other property to which discharged hazardous substances or hazardous wastes originating at the industrial establishment have migrated, *or* that *any discharged hazardous substances or hazardous wastes* present at the industrial establishment or that have migrated from the industrial establishment *have been remediated* in accordance with applicable remediation regulations.
> [Emphasis added.]

*See also N.J.S.A.* 13:1K–8 (defining a "no further action letter"). The definition further provides that "[t]he Department may issue a 'no further action letter' if hazardous substances or hazardous wastes *remain* on the industrial establishment or any other property *with appropriate engineering and institutional controls.*" *N.J.A.C.* 7:26B–1.4 (emphasis added).

[6] Appellant disputes that it is the source of any contamination on the property, asserting that it only stored or handled de minimis quantities of hazardous materials on the site.

The Department's November 10, 2008 rescission letter further informed appellant that the investigation had "determined that the contaminants in ground water have never been used [by the successors in title] in their operations suggesting that the discharge occurred during or before the ownership of the site" by appellant. In order to regain compliance with ISRA, the Department instructed appellant to complete an application for a remediation agreement and submit the application within fifteen days of receiving the November 10, 2008 letter. The Department also directed appellant to "conduct an investigation of the former Des Champs [site] to further define the source of the ground water contamination." Additionally, the Department directed appellant to "submit a Preliminary Assessment and Site Investigation Report with the appropriate review fees for further review by the Department within 180 days of receipt of [the November 10, 2008] letter."

Appellant did not carry out the demands set forth by the Department in its November 10, 2008 letter. Instead, on March 23, 2009, appellant submitted to the Department a DQE affidavit from Mr. Des Champs, pursuant to *N.J.S.A.* 13:1K–9.7 and former *N.J.A.C.* 7:26B–2.3 (codified in its current form at *N.J.A.C.* 7:26B–5.9).

In a transmittal accompanying the DQE affidavit, appellant's counsel noted that, after a review of prior operations, appellant "determined that it handled a de minimis quantity of hazardous substances at the property. Therefore [appellant's] operations were exempt from ISRA." Appellant likewise asserts in its brief on appeal that "[n]one of these substances were the substances of concern alleged to have contaminated the groundwater at and near the [Okner Parkway] [p]roperty."

On April 21, 2009, the Department denied appellant's application for a DQE. In its letter memorializing that denial, the Department stressed "the overlying presumption that an industrial establishment, without regard to fault, should not qualify for a [DQE] when contamination is known to exist at the site."

Subsequently, in letters dated May 7, 2009 and June 24, 2009, appellant requested that the Department reconsider the denial of its application for a DQE. The Department declined to change its position. Instead, it issued a written final agency determination on January 21, 2011, that denied appellant's request to reconsider the rejection of the DQE application. The Department maintained that, in order to regain compliance, appellant must adhere to the requirements of its earlier letter, which required that appellant complete a Remediation Agreement application, "conduct an investigation ... to further define the source of the ground water contamination ... [and] submit a Preliminary Assessment and Site Investigation Report[.]"

Pursuant to the Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 to –23.11z ("the Spill Act"), the Department issued a directive concerning the subject property on September 30, 2010. The Spill Act directive instructed appellant and intervenor, among other things, to "[h]ire a Licensed Site Remediation Professional to perform the remediation at the [s]ite[,] ... complete delineation of the [i]mmediate [e]nvironmental [c]oncern contaminant source[,]" conduct remediation, and "[e]stablish a remediation funding source[.]" [7]

Following the Department's final agency decision of January 21, 2011, appellant filed an appeal. Appellant's successor in title, R & K, intervened with this court's permission in the appeal.

Appellant urges that the Department's denial of its DQE application be reversed. In particular, appellant argues in its brief that "ISRA does not require that a property be free from contamination as a condition to obtaining" the exemption. Appellant maintains that the public policies underlying ISRA reflect a legislative desire to relieve property owners and industrial estab-

---

[7] Appellant has not sought review of the Spill Act directive in this appeal, although it asserts in its brief that it is not responsible under the Spill Act because it was not the discharger of the pollutants. The appeal is confined to the conditions that the Department imposed on appellant obtaining a DQE.

lishment operators from certain onerous regulatory obligations that had existed under the predecessor statute, the Environmental Cleanup Responsibility Act of 1983 ("ECRA"), *N.J.S.A.* 13:1K–6 to –14. In that vein, appellant contends that the Legislature, in codifying a "de minimis" exemption within ISRA, "recognized the unfairness of requiring an owner or operator who uses a de minimis quantity of hazardous substances to bear the cost of investigating and remediating a substantial discharge." Appellant further argues that the Department's attempt through administrative regulations to impose such obligations upon an owner or operator, as a condition of DQE approval, is ultra vires, and that those regulations must be declared invalid.

Conversely, the Department and intervenor maintain that the investigatory and remedial obligations imposed upon appellant and other DQE applicants to assure that the property is "clean" are impliedly authorized under ISRA and other applicable statutes. They argue that requiring such owners or operators of sites that once housed de minimis quantities of hazardous materials to confirm that the property is now free of contamination is consistent with the overall policy objectives of the statutory scheme. They maintain that neither ISRA nor SRRA preclude imposing such "contamination free" conditions as part of DQE approval. Consequently, they defend the validity of the Department's regulations imposing such conditions, including the amended provisions of *N.J.A.C.* 7:26B–5.9 that became effective in May 2012.[8]

## II.

### A.

We begin our analysis with an overview of the statutory framework, starting with ECRA, followed by ISRA, and culminating

---

[8] In June 2012, we requested post-argument supplemental letter briefs from the parties addressing the implications for this appeal of the newly-adopted May 2012 regulations. We have received and duly considered those supplemental letter briefs.

most recently with SRRA. We also review the history of the corresponding pertinent regulations.

ECRA was enacted in 1983. As the Supreme Court has recognized, "[t]he Legislature enacted ECRA in response to the inordinate time and money spent in determining fault and apportioning liability for the dumping of toxic wastes." *In re Adoption of N.J.A.C. 7:26B,* 128 *N.J.* 442, 446, 608 *A.*2d 288 (1992). The "essential goal" of ECRA was "to secure the cleanup of industrial sites at the earliest possible date." *Id.* at 447, 608 *A.*2d 288. To achieve those goals, ECRA generally required that properties that housed industrial establishments be "in an environmentally appropriate condition" before those properties were sold, transferred or closed. *Ibid.*

More specifically, ECRA called for an owner or operator planning to close, sell or transfer operations at such a site to (1) notify the DEP within five days of the intention to pursue a triggering event under the statute; (2) submit to the DEP, within sixty days before a transfer or sale, or at the time of closure, either a cleanup plan for the site or a "negative declaration" attesting that no hazardous discharges had occurred or that any such discharges had been cleaned up; and (3) provide financial security assuring the performance of a cleanup plan. *Id.* at 447–48, 608 *A.*2d 288. A failure to comply with these ECRA requirements authorized the DEP to invalidate the sale or transfer and, moreover, to impose liability upon the owner or operator for cleanup and removal costs. *Id.* at 449, 608 *A.*2d 288.

Eventually, it became apparent that strict enforcement of ECRA obligations upon owners and operators that handled or stored only "de minimis" quantities of hazardous substances on their properties was too onerous, and that such onerous measures thwarted the efficient transfer of title and the cessation of business operations. Consequently, effective in December 1987, the Department promulgated regulations establishing a de minimis exemption. *See* 19 *N.J.R.* 2435(a), 2489 (Dec. 21, 1987), codified at former *N.J.A.C.* 7:26B–10.1. Apparently, the authority for the

DQE regulations derived from the definition of "industrial establishment" found in the definitions section of ECRA. *See N.J.S.A.* 13:1K–8(f) (stating that the Department may "exempt certain sub-groups or classes of operations within those sub-groups within the Standard Industrial Classification major group numbers listed in this subsection upon a finding that the operation of the industrial establishment does not pose a risk to public health and safety"). Notably, those original DQE regulations issued under ECRA did not expressly require the owner or operator to attest that hazardous discharges had not occurred on the site or that the property was not contaminated. *But see* 19 *N.J.R.* 2435(a), 2466–68 (Dec. 21, 1987) (responses to comments on *N.J.A.C.* 7:26B–10.1) (indicating the Department's position that a DQE exemption "must be restrictive to ensure that no contamination exists" and that "a contaminated industrial site would not be eligible for such an exemption").

The Department subsequently amended the DQE regulations in June 1989, however, to specify that the applicant submit an affidavit attesting that there had been no discharge of hazardous substances at the site or that any such discharge had been remediated. In particular, the revised DQE regulation that became effective in August 1989, *N.J.A.C.* 7:26B–10.1, stated in pertinent part:

(d) To apply for a de minim[i]s quantity, the owner or operator of the industrial establishment shall submit the following to the Department:

i. *An affidavit stating that there has been no discharge(s)* of hazardous substances and wastes on site *or* that any discharge(s) of hazardous substances and wastes on *or* from the industrial establishment *has been cleaned up to the current satisfaction of the Department;* and

ii. The appropriate fee specified in *N.J.A.C.* 7:26B–1.10.

(e) The Department may require the owner or operator to submit a sampling plan for the industrial establishment when it has reason to believe that contamination may exist. In cases where a sampling plan has been required, *the Department may issue a de minim[i]s quantity exemption only where the owner or operator has complied with all applicable provisions of this section and where the results of an approved sampling plan indicate that there is no contamination from hazardous substances and wastes or where the Department has made a determination that no sampling plan is necessary.*

[Former *N.J.A.C.* 7:26B–10.1 (emphasis added); *accord* 21 *N.J.R.* 2367(a), 2382 (Aug. 7, 1989).]

That regulation was readopted without changes in 1992. 24 *N.J.R.* 4524(a) (Dec. 21, 1992).

In 1993, the Legislature amended and displaced ECRA with the passage of ISRA. ISRA was passed "in response to criticism that the [Department's] complicated program [under ECRA] had stagnated the transfer of contaminated property and had created other problems." *Fed. Pac. Elec. Co. v. N.J. Dep't of Envtl. Prot.*, 334 *N.J.Super.* 323, 333–34, 759 *A.*2d 851 (App.Div.2000). The Legislature recognized in ISRA that since the time of ECRA's passage, there had been " 'a significant advance in the body of knowledge concerning how to remediate contaminated sites efficiently and how to manage the remediation efficiently[.]' " *Id.* at 334, 759 *A.*2d 851 (quoting *N.J.S.A.* 13:1K–7). The Legislature further recognized that

it is in the interest of the environment and the State's economic health to promote certainty in the regulatory process by incorporating that knowledge to create a more efficient regulatory structure and to allow greater privatization of that process where it is possible to do so without incurring unnecessary risks to the public health or the environment.
[*Ibid.* (quoting *N.J.S.A.* 13:1K–7).]

To address these and other concerns, ISRA was designed to improve upon ECRA by "streamlining the regulatory process, by establishing summary administrative procedures for industrial establishments that have previously undergone an environmental review, and by reducing oversight of those industrial establishments where less extensive regulatory review will ensure the same degree of protection to public health, safety, and the environment[.]" *N.J.S.A.* 13:1K–7. Among other things, ISRA declared "that the new procedures established pursuant to [ISRA] shall be designed to guard against redundancy from the regulatory process and to minimize governmental involvement in certain business transactions." *Ibid.*

In contrast to ECRA, the Legislature included within ISRA a specific DQE provision. *See N.J.S.A.* 13:1K–9.7. However, unlike the revised DQE regulations previously adopted in 1989 by the

Department under ECRA, the statutory DQE provision, *N.J.S.A.* 13:1K–9.7, did not specify that applicants for a DQE must file an affidavit asserting that no discharge had occurred or that any discharge had been remediated. Instead, the statute allowed eligible applicants to avoid ISRA obligations by filing a written notice with the Department stating that the hazardous materials that had been present on the site were below certain prescribed levels:

> The owner or operator of an industrial establishment may, upon submission of a written notice to the [D]epartment, transfer ownership or operations or close operations *without complying with the provisions of section 4 of P.L.1983, c. 330 (C. 13:1K–9) (the general investigatory and cleanup obligations imposed upon such owners and operators) if the total quantity of hazardous substances and hazardous wastes* generated, manufactured, refined, transported, treated, stored, handled, or disposed of at the industrial establishment at any one time during the owner's or operator's period of ownership or operations:
>
> (a) *does not exceed 500 pounds or 55 gallons;*
>
> (b) if a hazardous substance or hazardous waste is *mixed* with nonhazardous substances, the total quantity in the mixture *does not exceed 500 pounds or 55 gallons;* or
>
> (c) if, in the aggregate, hydraulic or lubricating oil, *does not exceed 220 gallons.*
> [*N.J.S.A.* 13:1K–9.7 (emphasis added).]

Similarly, DQE regulations thereafter issued pursuant to ISRA do not contain any requirement that the applicant file an affidavit disavowing that any hazardous discharge had occurred.[9] Nor did those regulations require the DQE applicant to show that, if a discharge had occurred, the site has been cleaned up to the Department's satisfaction. *See* former *N.J.A.C.* 7:26B–2.3 (effective Sept. 20, 2004), *repealed on interim basis by* 41 *N.J.R.* 4467(a) (Dec. 7, 2009), *repealed permanently by* 43 *N.J.R.* 2581(b) (Oct. 3, 2011). Instead, those post-ISRA regulations that were in force from 1997 through 2009 unconditionally provided that:

> (a) An owner or operator who is granted a de minimis quantity exemption from the Department *shall be exempt from the provisions of this chapter,* except as

9 29 *N.J.R.* 4913(a), 4943–44 (Nov. 17, 1997) (adopting ISRA regulations); 35 *N.J.R.* 1415(a) (March 17, 2003) (readopting the regulations); 36 *N.J.R.* 4298(c), 4300 (Sept. 20, 2004) (replacing the former Standard Industrial Classification ("SIC") coding system with the North American Industrial Classification System ("NAICS") coding).

provided at *N.J.A.C.* 7:26B–8.1 (regarding the fee schedule), based on de minimis quantities of hazardous substances or hazardous waste generated, manufactured, refined, transported, treated, stored, handled or disposed of at an industrial establishment.

(b) The owner or operator *can obtain a de minimis quantity exemption if the following criteria are satisfied:*

1. *The total quantity of hazardous substances or hazardous wastes* generated, manufactured, refined, transported, treated, stored, handled or disposed of at the subject industrial establishment at any one time during the owner's or operator's period of ownership or operation, *does not exceed 500 pounds or 55 gallons;*

2. *If the hazardous substances or hazardous wastes are mixed with nonhazardous substances,* then the total quantity of hazardous substances or hazardous wastes in the mixture at any one time during the owner's or operator's period of ownership or operation, *does not exceed 500 pounds or 55 gallons;* and

3. *The total quantity of hydraulic or lubricating oil, in the aggregate, does not exceed 220 gallons* at any one time during the owner's or operator's period of ownership or operation.

(c) The total quantity of hazardous substances or hazardous wastes at an industrial establishment may be *a combination* of both (b)1 and 2 above; however, *in the aggregate, the total quantity shall not exceed 500 pounds or 55 gallons.*
. . . .

(e) The owner or operator of the subject industrial establishment that satisfies the criteria established in (b) above *shall submit:*

1. *A completed* de minimis quantity exemption *application* (see *N.J.A.C.* 7:26B–2.2(a)1 for application contents summary),[10] certified in accordance with *N.J.A.C.* 7:26B–1.6, to the Department at the address provided at *N.J.A.C.* 7:26B–1.5; and

2. Submit *the applicable fee* in accordance with *N.J.A.C.* 7:26B–8.

(f) *The Department shall review the application in accordance with N.J.A.C. 7:26B–1.7.*[11] The owner or operator may close operations or transfer ownership or operation of an industrial establishment upon receipt of the Department's written approval of the de minimis quantity exemption application.

[Former *N.J.A.C.* 7:26B–2.3 (emphasis added); *accord* 29 *N.J.R.* 4913(a), 4943–44 (Nov. 17, 1997) and 36 *N.J.R.* 4298(c), 4300 (Sept. 20, 2004).]

In March 2008, the ISRA regulations, which had been scheduled to expire that year, were extended by gubernatorial directive. *See*

---

10 Notably, the post-ISRA regulations did not require the application to include an affidavit from the applicant attesting that no discharges had occurred or that the property was not contaminated. 29 *N.J.R.* 4913(a), 4938–39, 4942 (Nov. 17, 1997).

11 Likewise, the standards expressed within the text of *N.J.A.C.* 7:26B–1.7 did not require that the applicant demonstrate that no hazardous discharges occurred or that the site was not contaminated.

40 *N.J.R.* 1645(b) (March 17, 2008). The Department thereafter readopted the extant ISRA regulations, without any changes, in August 2009. *See* 41 *N.J.R.* 3414(b) (Sept. 21, 2009).

In 2009, the Legislature enacted SRRA, in an effort to further improve the efficiency and speed with which environmental sites are remediated. *See* 43 *N.J.R.* 1077(a), 1078 (May 2, 2011). SRRA "creates a new site remediation paradigm pursuant to which sites would be remediated without prior Department[al] approval, but while still requiring the Department to maintain a certain level of oversight." *Ibid.; see also* Governor's Message on Signing (May 7, 2009) (stating that the law "will cut through the bureaucracy to streamline the clean[ ]up process and allow more than 19,000 contaminated sites to be evaluated more quickly. To be clear, we are cutting the red tape"). SRRA seeks to accomplish this goal through the licensing of private remediation professionals to oversee environmental remediation. *See* 43 *N.J.R.* 1077(a), 1078 (May 2, 2011).

To implement SRRA, *N.J.S.A.* 58:10C–29 authorized the Department to adopt interim and, thereafter, permanent regulations. The new statute instructed that such interim regulations were to be "effective immediately upon filing with the Office of Administrative Law and shall be effective for a period not to exceed 18 months, and may, thereafter, be amended, adopted or readopted by the [D]epartment[.]" *N.J.S.A.* 58:10C–29. Additionally, SRRA provided that "[t]he interim rules and regulations may include amendments to rules and regulations adopted pursuant to other laws, in order to make them consistent with the provisions of [SRRA]." *Ibid.*

Pursuant to that legislative authorization within SRRA, *N.J.S.A.* 58:10C–29, the Department promulgated interim regulations on November 4, 2009. Those interim regulations notably reinserted a provision in the DQE section, *N.J.A.C.* 7:26B–5.9(b),[12] similar to

---

[12] The interim regulations repealed the existing DQE regulation codified at *N.J.A.C.* 7:26B–2.3. 41 *N.J.R.* 4467(a) (Dec. 7, 2009).

the regulations that had been in force from 1989 through 1997, which allowed an owner or operator to obtain a DQE only if the site was not contaminated:

(b) The owner or operator can obtain a de minimis quantity exemption *if the following criteria are satisfied:*

1. The total quantity of hazardous substances or hazardous wastes generated, manufactured, refined, transported, treated, stored, handled or disposed of at the subject industrial establishment at any one time during the owner's or operator's period of ownership or operation, does not exceed 500 pounds or 55 gallons;

2. If the hazardous substances or hazardous wastes are mixed with nonhazardous substances, then the total quantity of hazardous substances or hazardous wastes in the mixture at any one time during the owner's or operator's period of ownership or operation, does not exceed 500 pounds or 55 gallons;

3. The total quantity of hydraulic or lubricating oil, in the aggregate, does not exceed 220 gallons at any one time during the owner's or operator's period of ownership or operation; *and*

4. The industrial establishment is *not contaminated* above any standard set forth in the Remediation Standards, *N.J.A.C.* 7:26D.

[*N.J.A.C.* 7:26B–5.9(b) (emphasis added); 41 *N.J.R.* 4467(a), 4481 (Dec. 7, 2009).]

Following a comment period, the Department readopted the interim regulations in September 2011 as final, including the provision in *N.J.A.C.* 7:26B–5.9(b)4 requiring that "[t]he industrial establishment [ ] not [be] contaminated[.]" *N.J.A.C.* 7:26B–5.9(b)(4); 43 *N.J.R.* 2581(b) (Oct. 3, 2011).

More recently, effective May 7, 2012, the Department issued further regulations under SRRA. As part of those newest regulations, subsection (e) of *N.J.A.C.* 7:26B–5.9 states that an applicant must show, to the best of its knowledge, that its property is not contaminated as a condition of obtaining a DQE:

(e) The owner or operator of the subject industrial establishment that satisfies the criteria established in (b) above *may apply for a de minimis quantity exemption by submitting:*

1. A completed de minimis quantity exemption application form ... certified in accordance with *N.J.A.C.* 7:26B–1.6, to the Department at the address provided on the form, that includes information that identifies the owner or operator and the industrial establishment, describes the quantities and nature of the hazardous substances or hazardous waste generated, manufactured, refined, transported, treated, stored, handled or disposed of at the industrial establishment, *and includes a certification that, to the best of the owner or operator's knowledge, the industrial establishment is not contaminated above any standard set forth in the Remediation Standards, N.J.A.C.* 7:26D[.]

[*N.J.A.C.* 7:26B–5.9(e) (emphasis added); *accord* 44 *N.J.R.* 1339(b), 1438 (May 7, 2012).]

In addition, the Department in May 2012 slightly revised the language of subsection (f) of *N.J.A.C.* 7:26B–5.9 to explain that a DQE applicant whose application is disapproved has the option of withdrawing its general information notice in lieu of remediating the property:

(f) The owner or operator:

1. May close operations or transfer ownership or operation of an industrial establishment upon receipt of the Department's written approval of the de minimis quantity exemption application; or

2. Shall remediate the industrial establishment in accordance with this chapter and the Administrative Requirements for the Remediation of Contaminated Sites, *N.J.A.C.* 7:26C, *or withdraw the general information notice pursuant to N.J.A.C. 7:26B–3.2(c)*, if the Department disapproves the application.

[*N.J.A.C.* 7:26B–5.9(f) (emphasis added); *accord* 44 *N.J.R.* 1339(b), 1438 (May 7, 2012).]

The May 2012 regulatory amendments otherwise left intact the "contamination free" requirements of *N.J.A.C.* 7:26B–5.9(b) that had been made permanent in September 2011. This occurred despite concerns expressed to the Department by some commenters that such requirements making a DQE applicant certify and establish that a site is "clean" are unduly burdensome, and that the requirements are not authorized by ISRA nor by any other statutory provision. *See* 44 *N.J.R.* 1339(b), 1365 (May 7, 2012) (comments 164, 165, and 166).

## B.

■■ In evaluating appellant's legal arguments contesting the validity of these "contamination free" DQE requirements, we bear in mind the deference that courts generally accord to state administrative agencies about matters within their sphere of experience and legislatively-delegated authority. We apply that deference because "a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." *In re Election Law Enforcement Comm'n Advisory Op. No. 01–2008*, 201 *N.J.* 254, 262, 989 *A.*2d 1254 (2010); *see also U.S. Bank, N.A. v. Hough*, 210

*N.J.* 187, 200, 42 *A.*3d 870 (2012) (quoting and applying that language); *In re Adoption of a Child by W.P.*, 163 *N.J.* 158, 173–74, 748 *A.*2d 515 (2000) (giving deference to an agency's interpretation of a statute).

That said, we are " 'in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue.' " *In re Taylor*, 158 *N.J.* 644, 658, 731 *A.*2d 35 (1999) (quoting *Mayflower Sec. Co. v. Bureau of Sec.*, 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973)); *see also U.S. Bank, supra*, 210 *N.J.* at 200, 42 *A.*3d 870 (quoting and applying that language); *Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot.*, 191 *N.J.* 38, 48, 921 *A.*2d 1122 (2007) (same). "[A]n administrative agency may not interpret a statute to give it greater effect than its statutory language permits." *In re N.J. Tpk. Auth. v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 73*, 150 *N.J.* 331, 351–52, 696 *A.*2d 585 (1997).

We also are cognizant that regulations promulgated by administrative agencies are presumed to be valid. *N.J. State League of Municipalities v. Dep't of Cmty. Affairs*, 158 *N.J.* 211, 222, 729 *A.*2d 21 (1999). "[U]nless such regulations are 'clearly [ultra vires] on their face,' the party contesting them has the burden of proving their invalidity." *N.J. Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 561, 384 *A.*2d 795 (1978) (quoting *In re Regulation F–22 of the Office of Milk Indus.*, 32 *N.J.* 258, 261–62, 160 *A.*2d 627 (1960)). Generally, "[a] finding of ultra vires action is disfavored." *In re Protest of Coastal Permit Program Rules*, 354 *N.J.Super.* 293, 329, 807 *A.*2d 198 (App.Div.2002) (citing *N.J. Guild, supra*, 75 *N.J.* at 561, 384 *A.*2d 795).

When deciding whether a statute authorizes a particular regulation, "a 'court may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives.' " *In re Stormwater Mgmt. Rules*, 384 *N.J.Super.* 451, 461, 894 *A.*2d 1241 (App.Div.) (quoting *N.J. Guild, supra*, 75 *N.J.*

at 562, 384 *A.*2d 795), *certif. denied,* 188 *N.J.* 489, 909 *A.*2d 724 (2006). " '[C]ourts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent.' " *Ibid.* (quoting *N.J. Guild, supra,* 75 *N.J.* at 562, 384 *A.*2d 795). " '[T]he absence of an express statutory authorization in the enabling legislation will not preclude administrative agency action where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation.' " *Ibid.* (quoting *In re N.J. Bd. of Pub. Utils.,* 200 *N.J.Super.* 544, 557, 491 *A.*2d 1295 (App.Div. 1985)).

■ Applying these general principles, we conclude that the Department, despite its important regulatory role and its expertise over environmental matters, acted in the present context beyond its legislatively-delegated powers. It did so by injecting into the DQE process a requirement that the governing statutes do not authorize, i.e., forcing an applicant that has only handled or stored de minimis quantities of hazardous materials to provide a certification that the property is free of contamination before its operations can be closed or title to its property transferred. The Legislature did not impose such conditions within the DQE provisions codified at *N.J.S.A.* 13:1K–9.7. Nothing in the legislative history of ISRA states that the statutory DQE provisions were intended to be subject to such substantial conditions. In fact, the imposition of such conditions runs counter to the stated policy objectives of ISRA and SRRA to "streamline the regulatory process" and "minimize governmental involvement in certain business transactions," *N.J.S.A.* 13:1K–7, at least, as here, for private parties that have only handled or stored minimal amounts of hazardous materials.

The Legislature's adoption of a statutory de minimis exemption in *N.J.S.A.* 13:1K–9.7 codifies the traditional common-law doctrine of *"de minimis non curat lex,"* meaning that "the law does not care for, or take notice of, very small or trifling matters." *Paternoster v. Shuster,* 296 *N.J.Super.* 544, 559, 687 *A.*2d 330 (App.Div.

1997); *accord Beseman v. Pa. R.R. Co.*, 50 *N.J.L.* 235, 238, 13 *A.* 164 (Sup.Ct.1888), *aff'd*, 52 *N.J.L.* 221, 20 *A.* 169 (E. & A. 1889); *Schlichtman v. N.J. Highway Auth.*, 243 *N.J.Super.* 464, 472, 579 *A.*2d 1275 (Law Div.1990). As Justice Long observed recently in applying de minimis principles in a land use case, the concept entails something that is " '[t]rifling; minimal' or '( [o]f a fact or thing) so insignificant that a court may overlook it in deciding an issue or case.' " *Nuckel v. Borough of Little Ferry Planning Bd.*, 208 *N.J.* 95, 100 n. 2, 26 *A.*3d 418 (2011) (alteration in original) (quoting *Black's Law Dictionary* 496 (9th ed.2009)).

■ When enacting ISRA, the Legislature incorporated into the statutory scheme these traditional notions of reduced concern for matters of "trifling insignificance." It did so by following the Department's original lead from 1987 and crafting a statutory de minimis exemption for property owners and operators of sites where only minor and inconsequential amounts of hazardous materials had been stored or handled. *See N.J.S.A.* 13:1K–9.7. The DQE provision within the statute is expressed with precision, and is limited to certain specified minimal pounds or gallons of hazardous substances. *Ibid.* The upshot of those provisions is to relieve such owners and operators of the more comprehensive investigatory and remedial burdens otherwise attendant under ISRA to the closure of a facility or a transfer of ownership. Their manifest objective is to avoid unduly encumbering such business transactions with regulatory burdens that would interfere with ISRA's general aim to "streamline" the regulatory process and to "minimize" governmental involvement.

To be sure, ISRA and SRRA have not eviscerated our State's additional legislative goals of remediating contaminated sites and protecting the public health, safety, and welfare. As appellant acknowledges, those important objectives remain enforceable through other environmental statutes and regulations including, but not limited to, the Spill Act. The more narrow question presented here is whether ISRA and SRRA authorize the Department to require DQE applicants to certify to the best of their

knowledge that their properties are free from contamination in order for their operations to be closed or the premises to be conveyed. We answer that question in the negative.

The Department and intervenor argue that the "contamination free" requirements imposed upon appellant here, and also reflected in the current DQE regulations, are impliedly authorized by ISRA. They characterize such requirements as an essential and inherent aspect of ISRA enforcement.

For example, in responding to commenters who had questioned the validity of the "contamination free" provisions within the 2011 interim regulations, the Department stated that the provisions are "not only consistent with ISRA, but also further[ ] the statute's legislative intent to ensure that the current generation of owners and operators address contamination at these sites so that burden does not fall on others who are less responsible for the contamination." 43 *N.J.R.* 2581(b), 2583 (Oct. 3, 2011).[13] That generic observation ignores, however, other important facets of ISRA, particularly the clearly-expressed objectives of the Legislature to streamline the regulatory process and to minimize undue governmental interference in certain business transactions. The substantial obligations the Department is imposing upon appellant and other "de minimis" owners and operators should be spelled out in the statute, not tacked on by the agency as a regulatory postscript.

The erratic regulatory history demonstrates that a "contamination free" condition of a DQE is not integral to the statutory framework. Indeed, the applicable DQE regulations from December 1987 through August 1989 (under ECRA), and again from November 1997 through November 2009 (under ISRA), enabled an applicant to obtain a DQE without also certifying that the

---

[13] Similarly, in connection with the newest regulations that became effective in May 2012, the Department responded to a commenter with its position that "the certification requirement is an essential compliance tool." 44 *N.J.R.* 1339(b), 1365 (May 7, 2012) (response to comment 164).

property was free from contamination. During those periods totaling more than thirteen years, the Legislature did not step in with statutory amendments compelling the Department to require DQE applicants to prove that their properties were clean. Instead, the Legislature acquiesced to a less onerous regulatory approach.

The Department's recent adoption of new regulations in May 2012 explaining that a DQE applicant only needs to certify that the property is not contaminated "to the best of [its] knowledge," see N.J.A.C. 7:26B–5.9(e)(1), lessens, but does not eliminate, the ultra vires problem. We appreciate that it is less onerous for an applicant to attest to the property's condition by considering only what the applicant presently knows, rather than requiring the applicant to go a step further and undertake what could be expensive and time-consuming site investigations and testing. Nevertheless, the Department has also insisted that a DQE applicant will not qualify for the exception if the site is contaminated because of the activities of the applicant or a prior owner or operator. 44 N.J.R. 1339(b), 1365 (May 7, 2012) (response to comment 164). Consequently, an innocent owner or operator who only handled or stored the de minimis amount prescribed by the statute and who did not discharge any of those materials onto the site will be unable to obtain a DQE if he or she knows that a prior owner contaminated some portion of the premises. In such instances, the sale or closure of the innocent applicant's business will be prohibited until the applicant meets the full panoply of obligations under ISRA, despite the fact that it safely and appropriately handled only minimal amounts of hazardous materials on the site. We detect no basis in the statute to saddle such a hypothetical innocent owner or operator with such obligations in order to obtain the DQE it otherwise is entitled to under the law.[14]

---

[14] We also point out that the Department did not give appellant in this case the opportunity to submit a best-of-knowledge certification because the Department already had concluded that the property was contaminated.

For these many reasons, we conclude that the Department acted arbitrarily and capriciously in this case, without statutory authorization, in denying appellant's DQE application on this particular basis and demanding corrective action. *See In re Herrmann*, 192 *N.J.* 19, 27–28, 926 *A.*2d 350 (2007) (noting the judiciary's well-established authority to overturn arbitrary or capricious decisions made by administrative agencies). Its final agency decision must therefore be set aside.

Lest our opinion be misunderstood, we emphasize that we do not pass upon the wisdom of the Legislature's policy choices. Nor do we preclude the Department from pursuing appropriate enforcement action against appellant and other DQE applicants under the Spill Act or other legislatively-authorized regulations, where the facts support such enforcement action. We also do not preclude intervenor or other private parties from invoking their contractual or other legal rights to compel DQE applicants to investigate and to remediate industrial sites. Our conclusions in this appeal are instead confined to the lack of delegated statutory authority within the ambit of the DQE process—no more and no less.

We acknowledge that the Department and intervenor have raised various policy arguments in support of requiring DQE applicants to certify to the best of their knowledge that their properties are not contaminated. They contend that conditioning approval of a DQE upon such a requirement helps assure that the contaminated properties in our State are cleaned up sooner rather than later, which was another general objective of ECRA and, thereafter, ISRA and SRRA. *See N.J.S.A.* 13:1K–7; 43 *N.J.R.* 1077(a), 1078 (May 2, 2011). Although we appreciate the legitimate interests encompassed by such policy arguments, they do not square with the Legislature's codification in ISRA of a DQE provision that is conspicuously bereft of such a substantial obligation. Nor can we reconcile these policy arguments with the strong expression of legislative interest within ISRA aimed at streamlining the regulatory process when industrial sites are sold

or closed and in limiting the degree of governmental involvement in such business transactions. *See N.J.S.A.* 13:1K–7.

Accordingly, we reserve the policy debate for the elected branches of our State government. In particular, nothing in this opinion precludes the passage of amended legislation that would explicitly and unambiguously require a DQE applicant to certify that its property is now "clean" before a closure or sale, or, at the very least, make clear that the Department is authorized to adopt and enforce regulations imposing such significant obligations.

We therefore reverse the Department's denial of a DQE to appellant based upon the unauthorized condition of assuring that the property is now free of contamination. The matter is remanded to the Department for further consideration of appellant's DQE application without regard to the offending condition.[15] The corresponding provisions within *N.J.A.C.* 7:26B–5.9 are declared invalid. In anticipation that the Department and intervenor may wish to seek further review of our determination and its potential systemic consequences, we stay our decision, sua sponte, for thirty days. If either the Department or intervenor files a petition for certification within that thirty-day period, the stay shall automatically continue unless and until the Supreme Court otherwise directs.

Reversed and remanded. We do not retain jurisdiction.

---

[15] In light of our disposition, we need not address the other issues raised by the parties, including intervenor's contention that appellant, as a former owner of the property, lacks standing to obtain a DQE. Additionally, we do not address intervenor's separate unadjudicated claims of waiver, estoppel and laches, and instead defer those discrete issues for resolution in the first instance by the Department. *See Nieder v. Royal Indemn. Ins. Co.,* 62 *N.J.* 229, 234, 300 *A.*2d 142 (1973) (stating that "appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available").